AMERICAN FOUNDATION (INC.) *v.* UNITED STATES (No. 3400) [1]

United States Court of Customs and Patent Appeals, April 27, 1931

*J. C. Cooper, jr., W. Curtis Bok* (*Knight, Adair, Cooper & Osborne,* and *Dechert & Bok,* of counsel) for appellant.

*Charles D. Lawrence,* Assistant Attorney General (*James R. Ryan,* · special attorney, of counsel), for the United States.

[Oral argument April 2, 1931, by Mr. Cooper, jr., and Mr. Ryan]

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges

BLAND, Judge, delivered the opinion of the court:

This is an appeal from a judgment of the United States Customs Court, Division One (one judge dissenting), which overruled appellant's protest, which protest was directed to the collector's classification of merchandise entered at the port of Jacksonville, Fla.

The importation consisted of a carillon, its accessories, and packing, and is described in the collector's letter of transmittal of the protest, as follows:

[1] T. D. 44872.

Carillon of 48 notes, consisting of 61 bells varying in diameters from 8 feet 6 inches to 8 inches with inscription, classified under paragraph 1443, value_____ $60, 172. 00

Clappers, hand claviers, practice clavier, steel frame and connections, and electric pneumatic automatic relaying apparatus for above, value_____ 21, 799. 00

Packing carillon and accessories _____ 2, 000. 00

Rate of duty, 40% equaling_____ 33, 588. 40

The entry of appellant contains substantially the same matter as above quoted.

Duty was assessed on the merchandise at 40 per centum ad valorem under the provisions of paragraph 1443 of the Tariff Act of 1922, for musical instruments and parts thereof. The protest was amended, and the right to amend was an issue before the court below but is not pressed here. The amended protest claims the goods to be free of duty under paragraph 1706, Tariff Act of 1922.

The record shows that Edward W. Bok, now deceased, was the editor of the Ladies Home Journal and vice president of the Curtis Publishing Co. and that, after his retirement, he caused to be organized the American Foundation and heavily endowed it for the purpose of philanthropic work; that Mr. Bok purchased between 40 and 50 acres of land at Mountain Lake, Lake Wales, Polk County, Fla., where he had a winter home, and that the tract of ground was the highest point in the State of Florida, and that thereafter it was developed as a sanctuary and was planted with native plants and made a place of rest for the public; that in 1925 the sanctuary was turned over to the American Foundation; that after the sanctuary was completed, Mr. Bok conceived the idea of constructing on the tract of ground the so-called "singing tower" with which this importation is concerned; that Mr. Bok was a native of Flanders where so-called "singing towers" had been developed to a fine state of perfection more than 100 years prior to the manufacture of the importation at bar; that Taylor & Co. of Loughborough, England, are makers of carillons and that these English bell makers had revived the industry of making carillons which were placed in high towers which served as bell houses.

Concerning the character of the bells, one Henry M. Nornavell, an Englishman, who had been acquainted with Edward W. Bok since 1917 and had met him in France or Belgium, and who, at the time of testifying, was the director of the Mountain Lake Sanctuary and Singing Tower, and who stated that he had studied the development and history of the carillon, testified, in part, as follows:

Q. Now how is a carillon tuned?—A. It is tuned in the chromatic scale.

Q. How are its overtones and undertones tuned?—A. They are all tuned with each other.

Q. Then to start with, in order to make a carillon, bell maker must make a bell of five tones to have each one tune with each other?—A. Yes; and each bell must be tuned with each other.

Q. What is the difference between the tuning of a carillon and a chime as known?—A. A chime is a set of bells struck or rung successively; they are usually a set or 8 or 12 bells. They are tuned in the diatonic scale.

Q. Can you play an ordinary musical composition on a chime?—A. No.

Q. Can you, on a carillon?—A. Yes.

Q. Did you say the development of carillons first came in the Low Countries?—A. In the Low Countries; yes.

Q. For what purpose were they developed?—A. Well they were developed from clocks, they gave little runs of the bells and finally developed into a musical instrument on which any musical composition can be played; all music is not adapted to the musical tones.

Q. There has been offered in evidence a book on carillons from the Taylor Bell Foundry of Loughborough, England; that was which carillon; will you describe the particular weight and size?—A. This carillon had 61 bells; when it first came out the last 13 or smaller bells were duplicated; 48 tones were in there.

Q. There were 48 tones?—A. There were 48 tones.

Q. What is the size of the largest bell?—A. It was approximately 11 tons, and varied to 11 pounds.

Q. What is the size of the largest bell?—A. 11 tons.

Q. Do you remember its diameter?—A. Approximately 8 feet, 8 feet high.

Q. It is stated in this memorandum from the Taylor Bell Foundry (at p. 5 of the book) that "The development of the modern carillon—i. e., the extended chromatic compass of bells—may be said to have begun about the end of the sixteenth century, and was the work almost entirely of bell founders in the Low Countries known now as Holland and Belgium." Is that in accordance with the information and knowledge that you gained from other sources?—A. It was.

Q. And those are the facts?—A. Yes.

Q. It is also stated that "The culmination of that era of carillon art was reached at the latter half of the seventeenth century, as instanced in the work of Francis and Peter Hemony. In the early eighteenth century some quite good work was done, but that the craft was already on the wane aesthetically and the carillons possessing any artistic merit which were founded in the following 200 years were very few indeed. That the revival of the craft in the present century to a glory greater than ever will be evidenced later." Would you say as the result of your investigation of the history of the making of carillons that this statement is correct?—A. Yes.

Q. In other words, as I take it then, the making of carillons became practically extinct for several hundred years?—A. They had.

  *   *   *   *   *   *   *

Q. *Is the carillon at Mountain Lake of which you are in charge a substantial copy in kind of the carillons of the Low Countries?*—A. *It is.*

Q. *Is it a substantial copy, then, of the work of art developed in the Low Countries in the Middle Ages and later?*—A. *It is.* [Italics ours.]

## On cross-examination, the witness further testified as follows:

Q. Are you a musician, Major?—A. I don't play any musical instrument.

Q. Will you state whether you have ever studied the theory of music?—A. I have not.

Q. You have seen a carillon of bells before and since its installation?—A. Yes.

Q. And may I ask if there is anything particularly æsthetic about those bells in their shape, size, construction, or finish?—A. No.

Q. Physically they have no artistic characteristics?—A. All bells have very great artistic characteristics.

Q. But have those any other artistic characteristics?—A. The shape, tending a slight bit of them, but nothing special.

Q. The value of the carillon is the ringing of the bells together in making notes and the music they produce?—A. Solely in the music.

Q. It has no value other than the music made by the carillonneur?—A. No.

Q. But if some other man played the bells without a competent carillonneur they would have no artistic or any other value?—A. No.

\*    \*    \*    \*    \*    \*    \*

Q. Major, you never took into consideration the physical characteristics or the looks, when you purchased it?—A. No, only the tone.

Q. And its sole purpose is to produce music; isn't that true?—A. Yes.

Q. And the public does not see a carillon in the tower?—A. No.

Q. So it does not make any difference as to what the size, shape, color, or music may be?—A. The tone is the value of the carillon.

Q. And its purpose is to produce music?—A. That is right.

Q. And without producing music, it is valueless, so much junk metal?—A. Yes, sir.

Q. Now, Major, the carillon might be well compared to a piano or an organ or any other instrument to produce music, that is, in its designing?—A. Yes.

Howard Fleming of Plainfield, N. J., after stating that he had investigated the history of the carillon, testified as follows:

Q. Have you investigated whether a true carillon can be made in the United States?—A. Yes, sir.

Q. What is the result?—A. That no carillon had been made in the United States.

\*    \*    \*    \*    \*    \*    \*

Q. Now isn't it true the purpose of a carillon is to produce sweet music, classical and otherwise, in the same way it is produced on other instruments such as violins or pianos?—A. Yes.

Q. It has no merit artistically, physically in the look to appeal to the eye?—A. Oh, well, you don't look at the bells, you say you hear them.

It is conceded in the argument of this case that there is no evidence in the record that the English bell manufacturers in making the bells in controversy attempted in any manner to copy any physical feature of *any particular bell or set of bells.*

The record shows that the American Foundation ordered the bells from Taylor & Co., after the tower had been planned by an American architect; that the English bell makers sent a man to this country to consider a design for the bells; that the American Foundation is a philanthropic society and that the merchandise was imported for the purpose of being placed in said tower and was not intended for sale or other purposes than is herein expressed.

It is shown that, upon completion, the singing tower and ground were publicly presented by President Calvin Coolidge "for visitation to the American people."

The record further shows that the land and tower are owned by the foundation and are supported and maintained by it; that the public has free access to the grounds, may listen to the music, and may, in some instances, obtain a pass to ascend the tower without any fee or entrance charge.

At the time of entry the merchandise was not claimed to be free by the importer. Some months subsequent to the entry and after the goods had been appraised and after the entry had been liquidated, appellant filed a bond and affidavit in attempted compliance with article 424 of the Customs Regulations of 1923. The Government in the court below and here contends that the bond and affidavit were filed too late and were not in accordance with the law and regulations of the Treasury Department and for that reason, among others, contends that the goods are not entitled to free entry.

The court below sustained the position of the Government that the bond and affidavit were not seasonably filed, but, in view of our holding as to the proper classification of the goods, we do not find it necessary to pass upon this question and do not do so.

Paragraphs 1443 and 1706 of the Tariff Act of 1922 are as follows:

PAR. 1443. Musical instruments and parts thereof, not specially provided for, pianoforte or player actions and parts thereof, cases for musical instruments, pitch pipes, tuning forks, tuning hammers, and metronomes, strings for musical instruments composed wholly or in part of steel or other metal, all the foregoing, 40 per centum ad valorem; tuning pins, $1 per thousand and 35 per centum ad valorem; violins, violas, violoncellos, and double basses, of all sizes, wholly or partly manufactured or assembled, $1 each and 35 per centum ad valorem; unassembled parts of the foregoing, 40 per centum ad valorem.

PAR. 1706. Works of art, collections in illustration of the progress of the arts, sciences, agriculture, or manufactures, photographs, works in terra cotta, parian, pottery, or porcelain, antiquities and artistic copies thereof in metal or other material, imported in good faith for exhibition at a fixed place by any State or by any society or institution established for the encouragement of the arts, science, agriculture, or education, or for a municipal corporation, and all like articles imported in good faith by any society or association, or for a municipal corporation, for the purpose of erecting a public monument, and not intended for sale nor for any other purpose than herein expressed; but bond shall be given, under such rules and regulations as the Secretary of the Treasury may prescribe, for the payment of lawful duties which may accrue should any of the articles aforesaid be sold, transferred, or used contrary to this provision, and such articles shall be subject at any time to examination and inspection by the proper officers of the customs: *Provided*, That the privileges of this and the preceding paragraph shall not be allowed to associations or corporations engaged in or connected with business of a private or commercial character.

There is no dispute, in the trial of this cause here, of the proposition that if the goods are not free of duty under paragraph 1706, they are dutiable as assessed under paragraph 1443 as a musical instrument and parts thereof.

Paragraph 1706 provides for seven classes of articles, which may be listed as follows:

1. Works of art.
2. Collections in illustration of the progress of the arts, sciences, agriculture, or manufactures.
3. Photographs.
4. Works in terra cotta, parian, pottery, or porcelain.
5. Antiquities.
6. Artistic copies of antiquities in metal or other material.
7. All like articles imported in good faith by any society or association, or for a municipal corporation, for the purpose of erecting a public monument, and not intended for sale nor for any other purpose than herein expressed.

The first six classes are free of duty if "imported in good faith for exhibition at a fixed place by any State or by any society or institution established for the encouragement of the arts, science, agriculture, or education, or for a municipal corporation." A proviso at the end of the paragraph limits the free importation of the articles provided for to those imported by associations or corporations not engaged in or connected with business of a private or commercial character.

It was admitted in argument by counsel for appellant that the claim for free entry applied only to the 61 bells and did not apply to the steel frame, connections, and electrical apparatus. Our conclusion as to the proper classification of the bells referred to in the entry as a "carillon of 48 notes" makes it unnecessary for us to pass upon any further question as to appellant's bringing itself and the purpose of its importation within the terms prescribed by the paragraph.

It is not seriously urged that the carillon is itself a work of art, and even though it be conceded that it is the work of a skilled artisan, we do not believe it responds to the definition of a work of art. *Mayers, Osterwald & Muhlfeld* v. *E. F. Bendler and United States*, 18 C. C. P. A. (Customs) 117, T. D. 44093.

That it is not a collection in illustration of the progress of the arts, etc., falling under the second class, is so obvious as to require neither discussion not citation.

It is urged by appellant that it may be regarded as an antiquity, but if not, that it should be regarded as an artistic copy of an antiquity in metal. Antiquities are defined in Webster's New International Dictionary (1925) as follows:

1. Quality of being ancient; ancientness; great age.
* * * * * * *
5. *Usually in pl.* A relic, monument, etc., of ancient times; as a coin, a statue, etc. [Italics quoted.]

The importation involved was made to order and admittedly has no age qualifications that entitle it to be styled an antiquity and is,

therefore, not classifiable as such. The record does not disclose that the importation is a copy of any antiquity, or for that matter a copy of any other article or set of articles. We do not think such a showing warrants the conclusion that the imported bells are copies of antiquities.

Appellant relied especially and here pressed vigorously its claim that the importation responds to the seventh class mentioned in the paragraph, "and all like articles imported in good faith [etc.]." Appellant's able counsel pointed out with much earnestness that "all like articles" should include the importation, since the nature of the importation, the purpose of the same, and the character of the importer were of the kind that Congress would desire to favor, as was evidenced by the context of the paragraph.

We can appreciate that it might be desirable from a legislative viewpoint to grant free entry to a musical instrument which was to be imported by a purely philanthropic organization for the enjoyment of the American public without charge, and we know of no good reason why the same considerations which prompted the express mention of certain articles in the paragraph should not have appealed to the legislature in respect to the importation at bar, but this was a consideration for the legislature and is not one for the courts. It is our province to determine whether or not Congress by the language used, when fairly and properly interpreted, if interpretation be required, did include it within the provision of the paragraph.

In the protest we find the following:

The third reason for protest is this:

On December 5, 1928, Senator Fletcher, of Florida, introduced into the Senate a bill, S. 4703, providing for the remission to the foundation of the duty paid in this case. A similar bill was introduced in the House by Representative Drain, of Florida. These bills were referred to the Senate Finance Committee and to the House Ways and Means Committee, respectively.

Regardless of whether or not these facts are before us for consideration, we can not see how the introduction of the bills referred to, in 1928, becomes pertinent in our attempt to construe the language used by the framers of the Tariff Act of 1922, although the introduction of such bills on the part of members of Congress was, obviously, an effort toward bringing about a result which we think the framers of the Tariff Act of 1922 failed to do.

We must, therefore, inquire: Is the imported article *like* any of the named articles? "Like" is defined in Webster's New International Dictionary (1925) as follows:

Having the same, or nearly the same, appearance, qualities, or characteristics; similar.

Certainly a musical instrument such as is at bar can not be said to have the same or nearly the same appearance, qualities, or charac-

teristics as any of the articles specifically named in the first six classes. It is not claimed to be the work of an artist nor can it be said to be like the work of an artist. It is certainly not like a collection, a photograph or a work in terra cotta, etc. It has none of the character- istics of an antiquity or an artistic copy of the same. True enough, there is a likeness in the purpose of its importation and in the public nature of its use to that provided for in the paragraph, but this like- ness is not the likeness which the term "and like articles" calls for.

We therefore conclude that the carillon at bar is not provided for in paragraph 1706 but is specifically provided for in paragraph 1443 and that the collector's classification was correct, and the judgment of the lower court, overruling the protest, should be and is *affirmed*.