24 C.C.P.A.(Customs)

## JAPAN IMPORT CO. v. UNITED STATES.
### Customs Appeal No. 4007.

Court of Customs and Patent Appeals.
Nov. 2, 1936.

James W. Bevans, of New York City, for appellant.

Joseph R. Jackson, Asst. Atty. Gen. (Daniel I. Auster, Sp. Atty., of New York City, of counsel), for the United States.

Lamb & Lerch, of New York City (Kenneth G. Osborn, of New York City, of counsel), amici curiæ.

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges.

GRAHAM, Presiding Judge.

The appellant imported from Japan, under the Tariff Act of 1930 (19 U.S.C.A. § 1001 et seq.), at the port of New York, certain shoes with canvas tops and rubber soles, which were dutiable at 35 per centum ad valorem under paragraph 1530 (e), § 1, of said Tariff Act (19 U.S.C.A. § 1001, par. 1530 (e). Appraisement was made of the shoes on the basis of American selling price, as provided in section 402 (g) of said Tariff Act (19 U.S.C.A. § 1402 (g), by virtue of the Proclamation of the President under the provisions of section 336 of the Tariff Act of 1930 (19 U.S.C.A. § 1336), which proclamation was issued February 1, 1933 (47 Stat. 2552) (T.D. 46158), 63 Treas.Dec. 232.

The importer, being dissatisfied with the appraisement, appealed to reappraisement, and after the taking of considerable testimony, both on the part of the importer and of the government, Presiding Judge McClelland, sitting as a single judge, sustained the appraisement. Appeal was then taken to the United States Customs Court and assigned to the Third Division, which affirmed the decision of the single judge. The importer has appealed.

The appellant makes two principal contentions here, as follows:

"1. Subdivision (b) of section 336 [19 U.S.C.A. § 1336 (b)], under which the appraisement was made, namely, the author-

ity to prescribe the American selling price of a like or similar article of domestic manufacture upon which to base the ad valorem duty, is unconstitutional.

"2. By reason of the superiority of the American shoe to the imported shoe in appearance, workmanship, construction, cost of production, and selling price, the domestic shoe is not like or similar to the foreign-made shoe within the meaning of the words 'like or similar' as used in section 336 of the Tariff Act of 1930 [19 U.S.C.A. § 1336] and appearing in the President's proclamation, under which appraisement was made."

In support of his contention, counsel for appellant argues: " * * * that section 336 (b) is an unlawful delegation of the taxing power committed to the Congress under the Constitution; that the assessment of duties in the instant case on the American selling price of an alleged like or similar domestic shoe is violative of the due process clause; and that the measuring of the tax (duty) on one person's property by reference to the property of another is, as held by the Supreme Court in the case of Hoeper v. Tax Commission of Wisconsin et al., 284 U.S. 206, 52 S. Ct. 120, 76 L.Ed. 248, likewise contrary to due process of law as guaranteed by the Constitution."

█ . It has been conclusively established that the fact-finding powers delegated to the President under the provisions of section 315 (a) of title 3, of the Tariff Act of 1922 (19 U.S.C.A. § 154), the predecessor section of section 336 of the Tariff Act of 1930, were not an unconstitutional delegation of legislative power to the President. Hampton, Jr., & Co. v. United States, 14 Cust.App. 350, affirmed in Id., 276 U.S. 394, 48 S.Ct. 348, 72 L.Ed. 624. Counsel for appellant, as we understand it, concedes this, but argues that that case and later cases have not passed upon the constitutionality of the plan provided by section 336 (b) of the Tariff Act of 1930, which permits the President, on finding that an equalization of differences of cost of production cannot be accomplished by additional rates to those provided by statute, to equalize the same by directing that the ad valorem rates of duty may be based upon the American selling price of the domestic article, as the same is defined in section 402 (g) of said act (19 U.S.C.A. § 1402 (g).

The material portions of said act are as follows (included is paragraph 1530 (e), § 1, of said act, under which the imported merchandise is dutiable):

"Sec. 336. *Equalization of Costs of Production.*

"(a) Change of classification or duties. In order to put into force and effect the policy of Congress by this Act [chapter] intended, the commission (1) upon request of the President, or (2) upon resolution of either or both Houses of Congress, or (3) upon its own motion, or (4) when in the judgment of the commission there is good and sufficient reason therefor, upon application of any interested party, shall investigate the differences in the costs of production of any domestic article and of any like or similar foreign article. In the course of the investigation the commission shall hold hearings and give reasonable public notice thereof, and shall afford reasonable opportunity for parties interested to be present, to produce evidence, and to be heard at such hearings. The commission is authorized to adopt such reasonable procedure and rules and regulations as it deems necessary to execute its functions under this section. The commission shall report to the President the results of the investigation and its findings with respect to such differences in costs of production. If the commission finds it shown by the investigation that the duties expressly fixed by statute do not equalize the differences in the costs of production of the domestic article and the like or similar foreign article when produced in the principal competing country, the commission shall specify in its report such increases or decreases in rates of duty expressly fixed by statute (including any necessary change in classification) as it finds shown by the investigation to be necessary to equalize such differences. In no case shall the total increase or decrease of such rates of duty exceed 50 per centum of the rates expressly fixed by statute.

"(b) Change to American selling price. If the commission finds upon any such investigation that such differences can not be equalized by proceeding as hereinbefore provided, it shall so state in its report to the President and shall specify therein such ad valorem rates of duty based upon the American selling price (as defined in section 402 (g) ) [section 1402 (g)] of the domestic article, as it finds shown by the

investigation to be necessary to equalize such differences. In no case shall the total decrease of such rates of duty exceed 50 per centum of the rates expressly fixed by statute, and no such rate shall be increased.

"Sec. 402 (g) American selling price. The American selling price of any article manufactured or produced in the United States shall be the price, including the cost· of all containers and coverings of whatever nature and all other costs, charges, and expenses incident to placing the merchandise in condition packed ready for delivery, at which such article is freely offered for sale to all purchasers in the principal market of the United States, in the ordinary course of trade and in the usual wholesale quantities in such market, or the price that the manufacturer, producer, or owner would have received or was willing to receive for such merchandise when sold in the ordinary course of trade and in the usual wholesale quantities, at the time of exportation of the imported article.

"Par. 1530 * * * (e) Boots, shoes, or other footwear (including athletic or sporting boots and shoes), made wholly or in chief value of leather, not specially provided for, 20 per centum ad valorem; boots, shoes, or other footwear (including athletic or sporting boots and shoes), the. uppers of which are composed wholly or in chief value of wool, cotton, ramie, animal hair, fiber, rayon or other synthetic textile, silk, or substitutes for any of the foregoing, whether or not the soles are composed of leather, wood, or other materials, 35 per centum ad valorem." 19 U.S.C.A. §§ 1336 (a, b), 1402 (g), and § 1001, par. 1530 (e).

It is argued by counsel that to permit the valuation of an importer's goods to be made upon the basis of the value of domestic goods is, in fact, to fix the amount of duty on the importer's goods on the basis of the value of another's property, and that this is deprivation of due process of law. In support of this contention, the importer cites and relies upon the case of Hoeper v. Tax Commission of Wisconsin, et al., 284 U.S. 206, 52 S.Ct. 120, 122,. 76 L.Ed. 248. In the case cited, the appellant, a married man, was in receipt of income taxable to him under the income tax statute of the state. His wife was also in receipt of taxable income upon property with which her husband had no con-

nection. Separate returns were made by husband and wife, and the assessor of incomes combined these rates and assessed them all against the husband, under a section of the Wisconsin law. which provided that the income of the wife and each child under eighteen years of age should be added to the income of the husband or father and be assessed to him. As a result of this method of taxation, the appellant was obliged to pay more than would have been paid by the members of his family collectively, if assessed separately. The court held that this was a violation of the due process clause, inasmuch as the taxpayer was obliged to pay taxes, not alone on his own income, but upon the income of others. In delivering the opinion of the court, Mr. Justice Roberts made use of the following language, which is quoted by counsel for appellant here: "We have no doubt that, because of the fundamental conceptions which underlie our system, any attempt by a state to measure the tax on one person's property or income by reference to the property or income of another is contrary to due process of law as guaranteed by the Fourteenth Amendment. That which is not in fact the taxpayer's income cannot be made such by calling it income."

It is thought by counsel that this conclusively settles the proposition that the value of this appellant's imported goods cannot be measured by the value of the goods of the domestic producer.

On its part, the government contends that the matter is settled in our case of Kuttroff, Pickhardt & Co. v. United States, 12 Cust.App. 299, T.D. 40413. In the cases cited by the government, coal-tar. dyes were imported under the Tariff Act of 1922, and were appraised at the American selling price under paragraph 28, § 1, of said act (19 U.S.C.A. § 121, par. 28). That paragraph was, in substance, as follows: "Par. 28. *Coal-tar products:* All colors, dyes, or stains, * * * 45 per. centum ad valorem based upon the American selling price (as defined in subdivision (f) of section 402, title (4) [section 239 of this title] of any similar competitive article manufactured or produced in the United States, and 7 cents per pound. If there is no similar competitive article manufactured or produced in the United States then the ad valorem rate shall be based upon the United States value, as defined in subdivision (b) of section 402, Title IV [section 237 of this title]. For the purposes of this par-

agraph any coal-tar product provided for in this act [chapter] shall be considered similar to or competitive with any imported coal-tar product which accomplishes results substantially equal to those accomplished by the domestic product when used in substantially the same manner."

Section 402 (f) of said Tariff Act of 1922 (19 U.S.C.A. § 239), which defined American selling price, was as follows: "Sec. 402. (f) The American selling price of any article manufactured or produced in the United States shall be the price, including the cost of all containers and coverings of whatever nature and all other costs, charges, and expenses incident to placing the merchandise in condition packed ready for delivery, at which such article is freely offered for sale to all purchasers in the principal market of the United States, in the ordinary course of trade and in the usual wholesale quantities in such market, or the price that the manufacturer, producer, or owner would have received or was willing to receive for such merchandise when sold in the ordinary course of trade and in the usual wholesale quantities, at the time of exportation of the imported article."

Counsel for the importer in the last-cited case contended, as here, that the provision fixing the value of coal-tar products for duty purposes was unconstitutional because it was levied, "not on the value of merchandise imported but on the value of similar property belonging to another; second, that the power to fix the amount of tax payable is delegated by paragraph 28 and subdivision (f) of section 402 to domestic manufacturers of dyes and may be increased or decreased without any limitation whatever by the uncontrolled acts of such manufacturers; third, that section 28 is not designed to raise revenue 'to pay the debts and provide for the common defense and general welfare of the United States,' but is designed for the purpose and has the operation and effect of granting a monopoly to certain persons or classes of persons in the manufacture of certain commodities in the United States and in the importation and sale of similar commodities imported from abroad by delegating to such persons the power to fix the 'taxes' payable by themselves and others."

Smith, Judge, writing the opinion of the court, discussed this proposition in detail, and with great clarity, and said, in part:

"The determination of the value of one article by ascertaining and accepting the value of a similar or comparable article is far from new to customs practice and to customs legislation. Indeed, in the appraisement of merchandise, appraising officers have for a long time been authorized to take into consideration the wholesale price at which similar or comparable merchandise was sold or offered for sale. See section 11 of the act of 1890, as reenacted by section 32 of the act of 1897; section 1 of the act of 1909; and paragraphs K and R of the act of 1913.

"The American selling price and the United States value, as defined in administrative section 402, do not permit the making of artificial prices or the control by domestic interests of the duties to be assessed on foreign goods. The American selling price and United States value is not the price at which domestic products are offered to a favored few in limited quantities in a market specially created or restricted for the purpose of fixing the duties to be assessed on importations, but it is the price at which such products are freely offered for sale to all comers in the usual wholesale quantities and in the principal markets established for such goods in the ordinary course of trade. Individuals, firms, or corporations having a monopoly of some particular commodity can not establish the statutory American selling price by special factitious offerings or by sales to controlled or favored purchasers or by transfers of less than the usual wholesale quantities or by transactions in a market not recognized by the trade and not developed in the ordinary course of business.

"Congress was strictly within its rights in fixing an ad valorem rate of duty on imported coal-tar products and in defining the American selling price or United States value as the value to which that rate should be applied. Whether the power to lay duties and collect them was well or badly exercised in the enactment of paragraph 28 and section 402, is not for us to say—that is a political, not a judicial question. The Lottery Case [Champion v. Ames], 188 U.S. [321], 327, 363 [23 S. Ct. 321, 47 L.Ed. 492]."

We can see little or no distinction in principle between our holding in the Kuttroff-Pickhardt Case, supra, and the rule which is applicable here. The importer is not being taxed here upon property

which is not his, and over which he has no supervision or control. He is bringing goods into the ports of this country for competition with goods produced within the country. He may do so or not, as he likes. If he chooses to import them, if their dutiable rate is upon an ad valorem basis, he subjects himself to any measure of their value which the Congress, in the exercise of its legislative power, chooses to impose. The value may be legislatively declared to be the value of the same in the foreign country of their production or it may equally be fixed upon the basis of the value of the same goods in this country. There is no constitutional inhibition against fixing the value of the same by comparison with similar goods or competitive goods in the markets of this country. This is all a political matter with which the lawmaking body has to deal. The importer has no vested right in and to a certain rate of taxation. Therefore, he may not complain if he believes the value of his goods for dutiable purposes is fixed upon a wrong basis. In Norwegian Nitrogen Products Co. v. United States, 20 C. C.P.A. (Customs) 27, T.D. 45674, this court said: "However, we do not mean to say, even under these supposed circumstances, that the interested party has a right in a given tariff rate. No one has any legal right to the continuance of a customs duty. Indeed, he may be deprived of the right of importation entirely."

The Supreme Court of the United States, in affirming this judgment in 288 U.S. 294, 318, 53 S.Ct. 350, 359, 77 L. Ed. 796, said: "No one has a legal right to the maintenance of an existing rate or duty. Neither the action of Congress in fixing a new tariff nor that of the President in exercising his delegated power is subject to impeachment if the prescribed forms of legislation have been regularly observed."

In Board of Trustees of the University of Illinois v. United States, 20 C.C.P.A. (Customs) 134, T.D. 45773, we said, in part: "The appellant has treated this question as if the right to import were undisputed, and the imposition of a tax was upon not only the exercise of a necessary governmental agency, but upon the exercise of a right which was absolute. But this view is fallacious. No individual has a vested right to import articles from a foreign country. His right to do this must

depend upon the authority to do so conferred by act of Congress and upon the terms so fixed. Buttfield v. Stranahan, supra [192 U.S. 470, 24 S.Ct. 349, 48 L.Ed. 525]."

In affirming our judgment in that case, 289 U.S. 48, 57, 53 S.Ct. 509, 77 L.Ed. 1025, Chief Justice Hughes, speaking for the Supreme Court, said: "The Congress may determine what articles may be imported into this country and the terms upon which importation is permitted. No one can be said to have a vested right to carry on foreign commerce with the United States. Buttfield v. Stranahan, supra; The Abby Dodge v. U. S., 223 U.S. 166, 176, 177, 32 S.Ct. 310, 56 L.Ed. 390; Brolan v. United States, 236 U.S. 216, 218, 219, 35 S.Ct. 285, 59 L.Ed. 544; Weber v. Freed, 239 U.S. 325, 329, 330, 36 S.Ct. 131, 60 L.Ed. 308, Ann.Cas.1916C, 317. If the Congress saw fit to lay an embargo or to prohibit altogether the importation of specified articles, as the Congress may (U. S. v. The Brigantine William, Fed.Cas.No. 16,700, 2 Hall's Amer.L.J., 255; Gibbons v. Ogden, supra, 9 Wheat. 1, at pages 192, 193, 6 L.Ed. 23; Brolan v. United States, supra; Weber v. Freed, supra; Atlantic Cleaners & Dyers v. United States, 286 U. S. 427, 434, 52 S.Ct. 607, 76 L.Ed. 1204), no state by virtue of any interest of its own would be entitled to override the restriction. The principle of duality in our system of government does not touch the authority of the Congress in the regulation of foreign commerce."

If it be unconstitutional and a denial of due process of law to compute value of imported goods by the value of the goods of another, then many of the laws which have been enacted from time to time, providing methods for the ascertainment of such values, have been invalid. For instance, the Tariff Act of 1922 provided, section 402 (b), 19 U.S.C.A. § 235, that the foreign value of imported merchandise shall be the market value or the price "at which such or *similar* merchandise is freely offered for sale." (Italics ours.) The same section, subdivision (c), 19 U.S. C.A. § 236, provided that the export value might be fixed by comparison with the price or value of "such or similar merchandise." The same section, subdivision (d), 19 U.S.C.A. § 237, fixed the United States value by the price of "such or similar imported merchandise" as sold or offered in

this country. The Tariff Act of 1930, in section 402, subds. (c), (d), and (e), 19 U.S.C.A. § 1402 (c–e), defining foreign, export, and United States values, respectively, has similar provisions. These provisions of law, which are old in customs legislation, permit and direct the valuation of goods to be made by comparison with the goods of others. All of these provisions, if we follow the argument for appellant here, are violative of the constitutional rights of the importer, and certainly no one will make such a contention.

We are of opinion that the quoted language of the Supreme Court in the Hoeper Case, supra, is construed more broadly than the language justifies. It must be read upon the facts of that case, and, as so read, its meaning is not broad enough to be applicable to the facts here involved.

Counsel for importer argues that in the event that this court be of opinion that the statute here involved is constitutional, the appraisement must be held invalid because the imported goods were not appraised by comparison with "like or similar domestic articles," as is provided by said section 336 (19 U.S.C.A. § 1336). Upon this issue, an extensive record was made before the single judge, consisting of the testimony of William Gold, Examiner at the Port of New York, who examined the imported merchandise in this case, and Carl Heymann, Fred W. Sturtevant, Jack Macht, and Leon Levy, witnesses called by the importer, and John J. Brady, Ralph F. Little, and Robert L. Rice, called on behalf of the government.

It appears from the testimony of the Examiner, Gold, that in ascertaining American selling price the witness made investigation in the branch houses of Hood Rubber Company, Firestone Rubber Company, United States Rubber Company, and Cambridge Rubber Company, and that he found "certain similarities" existing between the imported articles and the articles produced by those companies. Samples of the imported merchandise were introduced in evidence, and are known as Collective Exhibit 3. These are a pair of canvas topped shoes, of the "lace-to-toe" type, with rubber soles, and reinforcement of various portions of the toe and canvas tops with rubber pieces.

This witness, in describing the similarity of the imported goods and the goods of the domestic producers said, in part: "I can tell without samples. I found that on imported articles of this description, an article known as a lace-to-toe (commonly known as a 'sneaker'), the imported article had a corrugated sole; the domestic articles had corrugated soles; the upper of the imported articles was composed of an approximately 7-ounce fabric; the domestic articles were composed of an approximately 7-ounce fabric. The lining was drill lining in both cases. On the domestic articles there were sidestays, backstays, ankle patches and eyelet stays; and on the imported article it was the same situation—same sidestays, backstays, ankle patches and eyelet stays as on the domestic articles. They were all double-stitched throughout on the imported article and there was single stitching on the eyelet stay of the domestic article. The imported article had a single foxing, an imitation foxing; the domestic articles had double foxing. From appearances, weights, style, etc., I consider both articles, in my opinion, like or similar."

Samples of the domestic goods with which comparisons were made were introduced in evidence and were before the court below and this court. The testimony shows that the imported shoes sold variously from 35 cents to 50 cents a pair at wholesale. The usual price for the domestic shoes, at the time of importation, was approximately 69 cents a pair wholesale. Some testimony was offered to the effect that the domestic product in some cases was of a better quality than the imported shoes; for instance, some of these domestic articles were said to have a cloth upper which permitted the passage of air, thus ventilating the shoe. The insoles were said to be closer fitting and the cross corrugations on the soles of better quality. It was also claimed that the soles of some of the domestic shoes were more flexible. The evidence, however, did show that the imported shoes and the domestic shoes were sold in the same establishments, to the same class of customers, and were adapted for the same uses and purposes. The witnesses differed to some degree as to whether they considered the imported and domestic shoes to be similar, some expressing the opinion definitely that they were similar for selling purposes, while others had the contrary opinion.

The single judge found on the evidence that the imported goods were like

or similar to the domestic product used by the appraiser in ascertaining value. The Third Appellate Division was of the same opinion after a review of the evidence. If there be any substantial evidence in the record to sustain the judgment of the Appellate Division, it will not be reversed. This is a familiar rule which requires no citation of authorities.

■ Under the Proclamation of the President and said section 336 (a) and (b), the appraisement of the imported goods was to be made at the American selling price of the domestic article like or similar to imported foreign articles, as defined by said section 402(g). Were the imported goods like or similar to the goods used by the appraiser in ascertaining value? The word "like" has been defined by us in American Foundation, Inc., v. United States, 19 C.C.P.A. (Customs) 36, T.D. 44872, by the adoption of the definition of the word, as taken from Webster's New International Dictionary, 1925, as follows: "Having the same, or nearly the same, appearance, qualities, or characteristics; similar."

In the cited case, a carillon of 48 notes, consisting of 61 bells, was imported for use in a bird sanctuary. These were contended to be "like" articles under the language of paragraph 1706, § 201, of the Tariff Act of 1922 (19 U.S.C.A. § 122, par. 1706) which provided, in part: "Par. 1706. Works of art, collections in illustration of the progress of the arts, sciences, agriculture, or manufactures, photographs, works in terra cotta, parian, pottery, or porcelain, antiquities and artistic copies thereof in metal or other material, imported in good faith for exhibition at a fixed place by any State or by any society or institution established for the encouragement of the arts, science, agriculture, or education, or for a municipal corporation, and all like articles imported in good faith by any society or association, or for a municipal corporation, for the purpose of erecting a public monument, and not intended for sale nor for any other purpose than herein expressed."

We said, after defining the meaning of the word "like," that the musical instrument imported could not be said "to have the same or nearly the same appearance, qualities, or characteristics as any of the articles specifically named in the first six classes. It is not claimed to be the work of an artist nor can it be said to be like the work of an artist. It is certainly not like a collection, a photograph or a work in terra cotta, etc. It has none of the characteristics of an antiquity or an artistic copy of the same." We therefore held that the imported articles were not "like" the other articles named in the paragraph.

■ The word "similar" has had frequent attention on the part of this court. We first gave it extended attention in United States v. Irving Massin & Bros., 16 Cust. App. 19, T.D. 42714. The words involved in the statute there in issue were "such" or "similar." We reiterated our former conclusion that the word "such" meant "identical," and as to the word "similar," referred to the definition given in Webster's New International Dictionary (1925), as follows: "Similar. a. 1. Nearly corresponding; resembling in many respects; somewhat like; bearing a general likeness."

Further in the opinion, in elaborating on the meaning to be attached to the word "similar," we said: "In view of the common meaning of the word 'similar' and of the authorities cited, we are of opinion, and so hold, that if goods are made of approximately the same materials, are commercially interchangeable, are adapted to substantially the same uses, and are so used, ordinarily, they are similar, within the meaning of section 402 (b). The importer or foreign manufacturer may not, by making a few changes in structure, or in giving the product a new name, or by restricting its sale to the American purchaser only, ipso facto remove his merchandise from section 402 (b), the foreign value provision."

We followed the Massin Case, supra, in United States v. F. Vietor & Achelis, 17 C.C.P.A.(Customs) 412, T.D. 43864. In the latter case we referred to the importation of two supposititious automobiles, one of a value of $5,000 and the other valued at $1,000, and concluded that although there may have been a similarity of use, these articles could not be similar for appraisement purposes.

Again we cited the Massin Case, with approval, in Charles Hardy, Inc. v. United States, 21 C.C.P.A.(Customs) 173, T.D. 46509. United States v. Thomas & Co., 21 C.C.P.A.(Customs) 254, T.D. 46788,

**132**

proceeds along the same line, although in the last case cited, Lenroot, Judge, specially concurring, expressed his view as follows: "In my opinion, if goods are made of approximately the same materials, are of the same approximate commercial value, are adapted to substantially the same uses, and are so used, then they are similar whether commercially interchangeable or not. The goods here in issue and the goods sold in Czechoslovakia are made of approximately the same materials, are approximately of the same commercial value, are adapted to substantially the same uses, and are so used, and are therefore similar within the statute, notwithstanding that, as above set forth, I do not believe them to be commercially interchangeable."

We again approved the definition made in the Massin Case, supra, in United States v. R. W. Cramer & Co., 21 C.C.P.A. (Customs) 379, T.D. 46911. For a further discussion of this subject, reference is also had to United States v. Freitag & Sons, Inc., et al., 21 C.C.P.A. (Customs) 500, T.D. 46961; United States v. The American Bluefriesveem, Inc., 22 C.C.P.A. (Customs) 67, T.D. 47063; United States v. Briones & Co., Inc., 22 C.C.P.A. (Customs) 245, T.D. 47158, and cases therein cited.

In the brief of counsel for the appellant, much significance is attached to the legislative history of said section 336 (19 U.S.C.A. § 1336) and its predecessor section 315 of the Tariff Act of 1922 (19 U.S.C.A. § 154 et seq.), and changes in phraseology are pointed out, and alleged changes in legislative intent are referred to. As we view the matter, however, it is unnecessary to go into a discussion of this subject. The only question is whether the court below erred in finding on the evidence under the law that the comparison had been made by the appraiser between the domestic articles and like or similar imported merchandise. We conclude, from a careful reading of the testimony and an inspection of the imported goods, as well as of the domestic articles, that there is substantial evidence in the record in support of the finding that the imported articles and the domestic articles were like or similar.

The judgment of the Third Division of the United States Customs Court is affirmed.

Affirmed.