## UNITED STATES *v.* ZACKS ET UX.

No. 44.  Argued October 21, 1963.—Decided November 12, 1963.

*J. Mitchell Reese, Jr.* argued the cause for the United States.  With him on the briefs were *Solicitor General Cox, Assistant Attorney General Oberdorfer, I. Henry Kutz* and *Mildred L. Seidman.*

*Scott P. Crampton* argued the cause for respondents.  With him on the brief were *Stanley Worth* and *Robert F. Conrad.*

Briefs of *amici curiae* were filed by *Robert H. Reiter* and *Otto L. Walter* for Anton Lorenz et al., and by *Grant W. Wiprud* and *Robert T. Molloy* for the New York, Chicago & St. Louis Railroad Company.

MR. JUSTICE HARLAN delivered the opinion of the Court.

The question in this case is whether § 117 (q) of the Internal Revenue Code of 1939, a 1956 amendment to

the Code which effected retroactive changes in the tax treatment of transfers of patent rights, gives rise to a claim for refund barred by the statute of limitations generally applicable to tax refund claims.

In 1952, Mrs. Zacks received royalties of about $37,000 on patents all substantial rights under which she had transferred by way of an exclusive license to a manufacturing corporation. In accordance with the then prevailing rulings of the Commissioner, the royalties were reported as ordinary income in the 1952 joint federal income tax return filed by Mrs. Zacks and her husband in 1953. The last payment of the taxes due was made in 1953. Under the statute of limitations governing a claim for refund of such taxes, the claim was barred in 1956. § 322 (b)(1), Internal Revenue Code of 1939, 26 U. S. C. (1952 ed.) § 322 (b)(1), 53 Stat. 91.[1] By Act of June 29, 1956, 70 Stat. 404, Congress amended the provisions of the 1939 Code governing the taxability of amounts received in consideration for the transfer of patent rights. The amendment, made applicable to tax years beginning after May 31, 1950, provided that in the circumstances present here such amounts should be taxed as capital gains rather than as ordinary income.

In reliance on this amendment, the taxpayers, on June 23, 1958, filed a claim for a *pro tanto* refund of their 1952

---

[1] Section 322 (b)(1) provides:

"Unless a claim for credit or refund is filed by the taxpayer within three years from the time the return was filed by the taxpayer or within two years from the time the tax was paid, no credit or refund shall be allowed or made after the expiration of whichever of such periods expires the later. If no return is filed by the taxpayer, then no credit or refund shall be allowed or made after two years from the time the tax was paid, unless before the expiration of such period a claim therefor is filed by the taxpayer."

Similar provisions are contained in § 6511 (a), (b) of the Internal Revenue Code of 1954, 26 U. S. C. § 6511 (a), (b), 68A Stat. 808.

income taxes. No action having been taken on the claim, they then commenced a refund suit in the Court of Claims. The United States asserted as a defense that the suit was barred by limitations under § 7422 (a) of the Internal Revenue Code of 1954, 26 U. S. C. § 7422 (a), 68A Stat. 876.[2] The Court of Claims granted the taxpayers' motion to strike this defense, 150 Ct. Cl. 814, 280 F. 2d 829, and, other issues in the case being settled by stipulation, entered judgment for the taxpayers.

Because of the recurring importance of the problem in the administration of the tax laws and a conflict between the decision below and those of some of the Courts of Appeals,[3] we granted certiorari. 371 U. S. 961. For reasons given hereafter, we hold that the taxpayers' claim was barred by limitations and, accordingly, reverse the judgment below.

Section 117 (q) here in question provides in pertinent part:

"(q) TRANSFER OF PATENT RIGHTS.—

"(1) GENERAL RULE.—A transfer (other than by gift, inheritance, or devise) of property consisting of all substantial rights to a patent, or an undivided interest therein which includes a part of all such

---

[2] Section 7422 (a) provides:

"No suit or proceeding shall be maintained in any court for the recovery of any internal revenue tax alleged to have been erroneously or illegally assessed or collected, or of any penalty claimed to have been collected without authority, or of any sum alleged to have been excessive or in any manner wrongfully collected, until a claim for refund or credit has been duly filed with the Secretary or his delegate, according to the provisions of law in that regard, and the regulations of the Secretary or his delegate established in pursuance thereof."

[3] Compare *United States* v. *Dempster,* 265 F. 2d 666 (C. A. 6th Cir.), and *Tobin* v. *United States,* 264 F. 2d 845 (C. A. 5th Cir.), with the decision in this case and *Hollander* v. *United States,* 248 F. 2d 247 (C. A. 2d Cir.), involving a similar problem.

rights, by any holder shall be considered the sale or exchange of a capital asset held for more than 6 months, regardless of whether or not payments in consideration of such transfer are—

"(A) payable periodically over a period generally coterminous with the transferee's use of the patent, or

"(B) contingent on the productivity, use, or disposition of the property transferred.

.        .        .        .        .

"(4) APPLICABILITY.—This subsection shall apply with respect to any amount received, or payment made, pursuant to a transfer described in paragraph (1) in any taxable year beginning after May 31, 1950, regardless of the taxable year in which such transfer occurred."

Since our sole concern is the intent of Congress in adding this section to the Code, it is necessary to look to the administrative and legislative background of the enactment. In 1946, the Commissioner of Internal Revenue announced his acquiescence in *Edward C. Myers,* 6 T. C. 258, in which the Tax Court held, as to a so-called "amateur" inventor,[4] that the transfer by exclusive license of all substantial rights under a patent was a sale or exchange of a capital asset, notwithstanding that the consideration for the license was royalties based on a percentage of the selling price of articles sold under the patent, and paid annually. 1946–1 Cum. Bull. 3. On March 20, 1950, the Commissioner reversed his position and announced the withdrawal of his acquiescence in *Myers,* stating that royalties measured or paid as in that case would be taxed as ordinary income. Mim. 6490,

---

[4] One not engaged in holding patent rights " 'primarily for sale to customers in the ordinary course of his trade or business,' " 6 T. C. 266, as distinguished from a "professional" inventor who is so engaged.

1950-1 Cum. Bull. 9. The new ruling was declared applicable to tax years beginning after May 31, 1950. In the years following 1950, the Commissioner adhered to his new position, despite its rejection by several courts.[5] The issue was settled for the future in 1954 by the enactment of § 1235 of the 1954 Code, 26 U. S. C. § 1235, 68A Stat. 329. Section 1235, applicable only prospectively, contains provisions identical in relevant part to those quoted above from § 117 (q).[6] Thus, prior to May 31, 1950, with exceptions noted hereafter,[7] and again from the beginning of 1954, the law has been that for which the taxpayers contend in their refund suit.

In 1955, the Commissioner issued a further ruling declaring that he would adhere to his 1950 ruling for tax years beginning after May 31, 1950, and prior to 1954. Rev. Rule 55-58, 1955-1 Cum. Bull. 97. As a result, the

---

[5] See *Kronner* v. *United States*, 126 Ct. Cl. 156, 110 F. Supp. 730; *Allen* v. *Werner*, 190 F. 2d 840 (C. A. 5th Cir.). The Commissioner's position was sustained by the Second Circuit in *Bloch* v. *United States*, 200 F. 2d 63.

Prior to 1946, several courts had taken the same position. *Commissioner* v. *Celanese Corp.*, 78 U. S. App. D. C. 292, 140 F. 2d 339; *Commissioner* v. *Hopkinson*, 126 F. 2d 406 (C. A. 2d Cir.).

[6] The relevant portions of § 1235 are:

"A transfer (other than by gift, inheritance, or devise) of property consisting of all substantial rights to a patent, or an undivided interest therein which includes a part of all such rights, by any holder shall be considered the sale or exchange of a capital asset held for more than 6 months, regardless of whether or not payments in consideration of such transfer are—

"(1) payable periodically over a period generally coterminous with the transferee's use of the patent, or

"(2) contingent on the productivity, use, or disposition of the property transferred."

[7] Section 1235 of the 1954 Code, and § 117 (q) of the 1939 Code which follows § 1235, made changes in the prior law with respect to the status of professional inventors and the "holding period" for both amateur and professional inventors. See pp. 67-69, *infra*.

Commissioner's position was that during the period from May 31, 1950 to 1954 there was a gap in the consistent application of the law as administratively and judicially established in 1946. It is evident that Congress intended to fill this gap when it enacted § 117 (q) in 1956. But we are not able to say that Congress intended thereby to reopen for retroactive adjustment tax years with respect to which refund claims were already barred by limitations.

Section 117 (q) does not in terms waive the application of the statute of limitations to refund claims then finally barred. On its face, § 117 (q) does no more than overrule the Commissioner's position on a matter of substantive law respecting the years 1950–1954. Nor is there anything in the legislative history which suggests that such a waiver is to be implied. On the contrary, such indications as there are suggest that Congress intended only to terminate litigation then pending. Representative Cooper, then Chairman of the House Ways and Means Committee, stated on the floor of the House:

"The relief provided by section 1235 [of the 1954 Code] is available only with respect to amounts received in any taxable year to which the 1954 Code applies. As the result of this and the announced policy of the Internal Revenue Service to continue its insistence on its position for years beginning after May 31, 1950, and prior to effective date of the 1954 Code taxpayers are still confronted with litigation for taxable years falling in this period in order to secure the rights to which the courts, with practical unanimity, have held they are entitled.

"H. R. 6143 [the original version of § 117 (q)] eliminates the necessity for such litigation by making the provisions of the 1954 Code available to years beginning after May 31, 1950." 101 Cong. Rec. 12708 (Aug. 1, 1955).

There are other indications that Congress had only this limited intention. It is abundantly clear that Congress is aware of the limitations problem as it affects retroactive tax legislation. On numerous occasions, Congress has included an express provision reopening barred tax years. We need refer here to only a few examples. Section 14 of the Technical Amendments Act of 1958, 26 U. S. C. § 172 (f)(3), (4), (g)(3), 72 Stat. 1606, 1611, provided rules for computing net operating loss deductions for tax years starting in 1953 and extending into 1954 and short tax years wholly within 1954. Subsection (c), added to the House bill by the Senate, provided expressly for a six-month period during which barred claims could be made. The addition was explained in the Senate report as follows:

"Your committee did amend the House provision, however, in one respect because 3 years have now elapsed since 1954 and many of the transitional years with which this provision is concerned are now closed years. To prevent relief from being denied in such cases, your committee amends this provision to provide that if a refund or credit with respect to this provision is prevented on the date of enactment of this bill or within 6 months after that time by the operation of any law or rule of law (except closing agreements or compromises) refund or credit, nevertheless, is to be allowed if the claim is filed within 6 months of the date of enactment of this bill." S. Rep. No. 1983, 85th Cong., 2d Sess. 24.

Again, by Act of August 9, 1955, 69 Stat. 607, Congress provided a one-year grace period for filing otherwise barred claims based on § 345 of the Revenue Act of 1951, 65 Stat. 452, 517, a retroactive relief measure affecting trust income accumulated for members of the Armed

Services dying in active service on or after December 7, 1941, and before January 1, 1948. The House report on the bill stated:

> "No relief was provided in the 1951 act, however, for cases where refunds or credits were barred by the expiration of the period of limitations, by prior court decisions, or for other similar reasons. Your committee is of the opinion that this failure was an oversight, and it believes that it is only equitable to extend treatment equivalent to that provided in section 345 of the Revenue Act of 1951 to cases where refunds or credits were barred by operation of law or rule of law (other than closing agreements or compromises)." H. R. Rep. No. 1438, 84th Cong., 1st Sess. 1–2.[8]

The most striking evidence of this sort, however, which we think is all but conclusive, is found in § 2 of the very Act here in dispute. That section, retroactively modifying § 106 of the 1939 Code, affected the taxation of payments received by a taxpayer from the United States with

---

[8] For other examples of retroactive tax measures in which express provision was made for the limitations problem, see Technical Amendments Act of 1958, §§ 92, 93, 100, 72 Stat. 1606, 1667, 1668, 1673; Act of September 14, 1960, § 5, 74 Stat. 1010, 1013; Revenue Act of 1962, §§ 26, 27, 76 Stat. 960, 1067.

For examples of such measures in which no provision was made to extend the period of limitations, see Act of February 11, 1958, 72 Stat. 3; Act of February 11, 1958, 72 Stat. 4; Technical Amendments Act of 1958, § 103, 72 Stat. 1606, 1675; Revenue Act of 1962, § 30, 76 Stat. 960, 1069.

Contrary to fears seemingly entertained by one of the *amici* in this case, we do not suggest that congressional practice in this regard gives rise to a presumption that where Congress has not provided expressly for a special limitations period in a retroactive tax statute, the relevant general statute of limitations was intended to apply. The significance of such congressional silence is to be judged on a case-by-case basis, as with all questions of statutory construction.

respect to a claim arising out of a construction contract for the Armed Services. Subsection (b) deals with the limitations problem as follows:

"(b) The amendment made by this section shall apply with respect to taxable years ending after December 31, 1948, notwithstanding the operation of any law or rule of law (other than section 3760 of the Internal Revenue Code of 1939 or section 7121 of the Internal Revenue Code of 1954, relating to closing agreements, and other than section 3761 of the Internal Revenue Code of 1939 or section 7122 of the Internal Revenue Code of 1954, relating to compromises). Notwithstanding the preceding sentence, no claim for credit or refund of any overpayment resulting from the amendment made by this section shall be allowed or made after the period of limitation applicable to such overpayment, except that such period shall not expire before the expiration of one year after the date of the enactment of this Act." 70 Stat. 405.

Section 2 went to the Conference Committee without such a provision. The Committee added the provision but made no comparable addition to § 1, with which we are concerned, or for that matter to § 3, which also made retroactive changes in the 1939 Code. It is plain, therefore, that the Congress had the limitations problem in mind at the very time that § 117 (q) was enacted. The taxpayers offer no justification for disregarding the difference in this respect between §§ 1 and 2, disrespect for which would render the carefully drawn limitations provisions of the latter section surplusage.

Both the taxpayers and the Government rely on *United States* v. *Borden Co.,* 308 U. S. 188, 198, where this Court said: "It is a cardinal principle of construction that repeals by implication are not favored. When there are

two acts upon the same subject, the rule is to give effect to both if possible." The correctness of this statement is not to be doubted. But the paucity of its assistance here is illustrated by the fact that both parties rely on it. The taxpayers place the second sentence in italics, and urge that § 117 (q) and the general statute of limitations are both given effect if the limitations period is made to run from the date of enactment of § 117 (q). The Government presses the first sentence, and urges that the tax-payers' position, in effect, repeals the statute of limitations *pro tanto*. There are difficulties with both of these analyses. Obviously, neither of them does more than cast a conclusion in terms of the general rules isolated from the particular circumstances of this case. Nor can the doctrine that remedial legislation is entitled to liberal construction, upon which the taxpayers also rely, be stretched to expand the reach of a statute of such evident limited purpose as this one.

A more difficult question is presented by the fact that § 117 (q) goes beyond the problem created by the Commissioner's vacillation affecting tax years between 1946 and 1954. By treating royalty payments as capital gains without regard to whether the patent rights transferred were capital assets, § 117 (q) made the favorable treatment available to professional as well as amateur inventors.[9] In addition, all royalties are treated as long-

---

[9] Such rights would not be capital assets if the patents were held for sale in the ordinary course of business. Internal Revenue Code of 1954, § 1221, 26 U. S. C. § 1221, 68A Stat. 321.

The taxpayers make much of the asserted fact that Mrs. Zacks was a professional inventor, reasoning therefrom that, as to her at least, § 117 (q) clearly established a new right. Cf. *Lorenz* v. *United States*, — Ct. Cl. —, 296 F. 2d 746. The Court of Claims made no finding as to whether Mrs. Zacks was an amateur or professional inventor. Whatever may be the validity and significance in other contexts of the distinction between creation of new rights and clarification of existing rights, we think that distinction is not controlling here, since Congress has evidenced its intent more directly.

term capital gains whether or not the rights transferred had been held for the requisite period. These provisions made clear changes in the law as it was in 1950 and subsequent years up to 1954. Insofar as they are applicable to years for which most claims for refund were barred in 1956, the Government's position renders the provisions without effect.

It is, of course, our duty to give effect to all portions of a statute if that is possible. *E. g., United States* v. *Menasche,* 348 U. S. 528, 538–539. But this general principle is meant to guide the courts in furthering the intent of the legislature, not overriding it. When rigid adherence to the general rule would require disregard of clear indications to the contrary, the rule must yield. Two considerations compel that result here. First, not only the administrative and legislative history of § 117 (q), discussed above, but also the selection of May 31, 1950, as the operative date leave no doubt that Congress was primarily concerned to settle the large volume of pending litigation arising out of the Commissioner's 1950 position, reaffirmed in 1955.[10] The date selected has no relevance either to the status of professional inventors or to the period for which patent rights must be held. Second, there is a ready explanation for the inclusion of the additional provisions. With irrelevant exceptions, § 117 (q) tracks the language of § 1235 of the 1954 Code. Pp. 61–62 and note 6, *supra.* It was wholly natural for Congress to deal with the pre-1954 period by adopting the language of the 1954 Code on the same subject. The House report on the bill leaves no doubt that this is what actually occurred. H. R. Rep. No. 1607, 84th Cong., 1st Sess. 1–2. It is a fair inference that but for the Commissioner's obduracy respecting amateur inventors, § 117 (q) would

---

[10] The existence of a substantial amount of such litigation is not questioned in this case. Some of it has been collected at pages 35–36 of the Government's brief.

not have been conceived. There is nothing to indicate that for some other reason Congress in 1956 had second thoughts about its failure in 1954 to make these identical provisions of § 1235 retroactive. To give the provisions in question the controlling weight that is claimed for them on the issue before us, would allow the tail to wag the dog. Of course, all of the amendatory provisions of § 117 (q) are fully effective with respect to years and claims not barred.

Finally, the taxpayers suggest that unless the statute of limitations is deemed waived, a premium is placed on taxpayer opposition to administrative rulings, since only those taxpayers who contested the Commissioner's position will now be able to claim a refund. But in view of the doubt surrounding the rulings involved in this case, emphasized by the cases overruling the Commissioner, this argument has less force than it might in another context. In any event, this problem always attends retroactive legislation of this sort, and acceptance of the taxpayers' argument would lead to the automatic waiver of the statute of limitations in every case. Whether or not this should be done is a matter for Congress to decide. Where Congress has decided otherwise, this Court has but one course.

*Reversed.*

MR. JUSTICE BLACK agrees with the Court of Claims and would affirm its judgment.

MR. JUSTICE DOUGLAS took no part in the consideration or decision of this case.