The NEW YORK, CHICAGO, AND ST. LOUIS RAILROAD COMPANY

v.

The UNITED STATES.

No. 385–61.

United States Court of Claims.

May 15, 1964.

Grant W. Wiprud, Washington, D. C., for plaintiff; Robert T. Molloy, Joseph M. Jones, Washington, D. C., and Thomas O. Broker, Cleveland, Ohio, of counsel.

J. Mitchell Reese, Jr., Washington, D. C., with whom was Asst. Atty. Gen., Louis F. Oberdorfer, for defendant; Edward S. Smith and Lyle M. Turner, Washington, D. C., were on the brief.

Before JONES, Chief Judge, and WHITAKER, LARAMORE, DURFEE and DAVIS, Judges.

DAVIS, Judge.

This is another tax refund case, held pending the decision of the Supreme Court, in which United States v. Zacks, 375 U.S. 59, 84 S.Ct. 178, 11 L.Ed.2d 128 (1963), supplies the major premise.[1] Cf. Kellogg-Citizens National Bank v. United States, Ct.Cl., 330 F.2d 635 (1964). Plaintiff sues for overpayment of World War II excess profits taxes for 1943 and 1944. The only dispute is over the timeliness of the refund claims. Under the normal limitations provisions, 1943 and 1944 were barred long before the claims were made in 1960. The taxpayer relies on a 1958 statute, retrospectively changing the substantive rule involved in the computation of the excess profits tax, as in effect granting a new limitations period.

The New York, Chicago and St. Louis Railroad, an accrual-basis taxpayer, had for many years prior to World War II used the "retirement" method of accounting for its depreciable roadway properties, as did other Class I railways. When, in 1942 and 1943, the Interstate Commerce Commission required many Class I roads to use, instead, "straight line" depreciation, plaintiff and others sought permission to account in the same manner for tax purposes. The Commissioner of Internal Revenue acceded to the request, but only upon the condition that the roads set up a reserve for past depreciation, which had been sustained

1. The parties have both filed memoranda on the relationship of Zacks to the present case.

prior to the accounting changeover date, in the amount of 30 percent of cost. This reserve for past or accrued depreciation was, specifically, to have a twofold effect: (1) it would limit the depreciation to be expensed in the future and (2) it would reduce accumulated earnings and profits in the determination of invested capital, thus lowering excess profits credits and raising excess profits taxes.

The Commissioner of Internal Revenue sent plaintiff a "terms letter" (dated September 15, 1944) which embodied these conditions.[2] On or about September 23, 1944, plaintiff accepted the limita-tions. Accordingly, plaintiff's excess profits for the calendar years 1943 and 1944 were calculated and returned in compliance with the Commissioner's letter; as a result, it claims that it paid excess profits taxes approximately $1,-500,000 greater than would otherwise have been owing for those periods.

Some fourteen years later, when refund claims for 1943 and 1944 were precluded,[3] Section 94 (known as the Retirement-Straight Line Adjustment Act of 1958) of the Technical Amendments Act of 1958, 72 Stat. 1606, 1669–1671,[4] was enacted. This provision permits tax-

2. The letter, similar to those sent other railroads which were changing their method of accounting for depreciable property, is set forth in full in finding 3(a); the excess profits phase is in Clause 6.

3. Claims for refund were barred sometime around 1946 and 1947. 1939 Code, § 322. See, also, 1954 Code, § 6511. No suit may be brought unless there has been a timely claim for refund. 1954 Code, § 7422.

4. The statute provides:
"SEC. 94. CHANGE FROM RETIREMENT TO STRAIGHT LINE METHOD OF COMPUTING DEPRECIATION IN CERTAIN CASES.
"(a) SHORT TITLE.—This section may be cited as the 'Retirement-Straight Line Adjustment Act of 1958'.
"(b) MAKING OF ELECTION.—Any taxpayer who held retirement-straight line property on his 1956 adjustment date may elect to have this section apply. Such an election shall be made at such time and in such manner as the Secretary shall prescribe. Any election under this section shall be irrevocable and shall apply to all retirement-straight line property as hereinafter provided in this section (including such property for periods when held by predecessors of the taxpayer).
"(c) RETIREMENT - STRAIGHT LINE PROPERTY DEFINED.—For purposes of this section, the term 'retirement-straight line property' means any property of a kind or class with respect to which the taxpayer or a predecessor (under the terms and conditions prescribed for him by the Commissioner) for any taxable year beginning after December 31, 1940, and before January 1, 1956, changed from the retirement to the straight line method of computing the al-lowance of deductions for depreciation.
"(d) BASIS ADJUSTMENTS AS OF 1956 ADJUSTMENT DATE.—If the taxpayer has made an election under this section then in determining the adjusted basis on his 1956 adjustment date of all retirement-straight line property held by the taxpayer, in lieu of the adjustments for depreciation provided in section 1016 (a) (2) and (3) of the Internal Revenue Code of 1954, the following adjustments shall be made (effective as of his 1956 adjustment date) in respect of all periods before the 1956 adjustment date:
"(1) DEPRECIATION SUSTAINED BEFORE MARCH 1, 1913.—For depreciation sustained before March 1, 1913, on retirement-straight line property held by the taxpayer or a predecessor on such date for which cost was or is claimed as basis and which either—
"(A) RETIRED BEFORE CHANGEOVER.—Was retired by the taxpayer or a predecessor before the changeover date, but only if (i) a deduction was allowed in computing net income by reason of such retirement, and (ii) such deduction was computed on the basis of cost without adjustment for depreciation sustained before March 1, 1913. In the case of any such property retired during any taxable year beginning after December 31, 1929, the adjustment under this subparagraph shall not exceed that portion of the amount attributable to depreciation sustained before March 1, 1913, which resulted (by reason of the deduction so allowed) in a reduction in taxes under the Internal Revenue Code of 1954 or prior income, war-profits, or excess-profits tax laws.
"(B) HELD ON CHANGEOVER DATE.—Was held by the taxpayer or a predecessor on the changeover date. This subparagraph shall not apply to property to which paragraph (2) ap-

payers who had switched from the retirement method to the straight-line depreciation method (subject to the terms-letter conditions) to elect to reduce the 30 percent reserve for past depreciation, in a prescribed manner, replacing it by

plies. The adjustment determined under this paragraph shall be allocated (in the manner prescribed by the Secretary) among all retirement-straight line property held by the taxpayer on his 1956 adjustment date.

"(2) PROPERTY DISPOSED OF AFTER CHANGEOVER AND BEFORE 1956 ADJUSTMENT DATE.— For that portion of the reserve prescribed by the Commissioner in connection with the changeover which was applicable to property—

"(A) sold, or

"(B) with respect to which a deduction was allowed for Federal income tax purposes by reason of casualty or 'abnormal' retirement in the nature of special obsolescence, if such sale occurred in, or such deduction was allowed for, a period on or after the changeover date and before the taxpayer's 1956 adjustment date.

"(3) DEPRECIATION ALLOWABLE FROM CHANGEOVER TO 1956 ADJUSTMENT DATE.—For depreciation allowable, under the terms and conditions prescribed by the Commissioner in connection with the changeover, for all periods on and after the changeover date and before the taxpayer's 1956 adjustment date.

This subsection shall apply only with respect to taxable years beginning after December 31, 1955.

"(e) EFFECT ON PERIOD FROM CHANGEOVER TO 1956 ADJUSTMENT DATE.—If the taxpayer has made an election under this section, then in determining the adjusted basis of any retirement-straight line property as of any time on or after the changeover date and before the taxpayer's 1956 adjustment date, in lieu of the adjustments for depreciation provided in section 1016(a) (2) and (3) of the Internal Revenue Code of 1954 and the corresponding provisions of prior revenue laws, the following adjustments shall be made:

"(1) FOR PRESCRIBED RESERVE. —For the amount of the reserve prescribed by the Commissioner in connection with the changeover.

"(2) FOR ALLOWABLE DEPRECIATION.—For the depreciation allowable under the terms and conditions prescribed by the Commissioner in connection with the changeover.

This subsection shall not apply in determining adjusted basis for purposes of section 437(c) of the Internal Revenue Code of 1939. This subsection shall apply only with respect to taxable years beginning on or after the changeover date and before the taxpayer's 1956 adjustment date.

"(f) EQUITY INVESTED CAPITAL, ETC.—If an election is made under this section, then (notwithstanding the terms and conditions prescribed by the Commissioner in connection with the changeover)—

"(1) EQUITY INVESTED CAPITAL. —In determining equity invested capital under sections 458 and 718 of the Internal Revenue Code of 1939, accumulated earnings and profits as of the changeover date, and as of the beginning of each taxable year thereafter, shall be reduced by the depreciation sustained before March 1, 1913, as computed under subsection (d) (1) (B); and

"(2) DEFINITION OF EQUITY CAPITAL.—In determining the adjusted basis of assets for the purpose of section 437(c) of the Internal Revenue Code of 1939 (and in addition to any other adjustments required by such Code), the basis shall be reduced by depreciation sustained before March 1, 1913 (as computed under subsection (d)), together with any depreciation allowable under subsection (e) (2) for any period before the year for which the excess profits credit is being computed.

"(g) DEFINITIONS.—For purposes of this section—

"(1) DEPRECIATION.—The term 'depreciation' means exhaustion, wear and tear, and obsolescence.

"(2) CHANGEOVER. — The term 'changeover' means a change from the retirement to the straight line method of computing the allowance of deductions for depreciation.

"(3) CHANGEOVER DATE. — The term 'changeover date' means the first day of the first taxable year for which the changeover was effective.

"(4) 1956 ADJUSTMENT DATE.— The term '1956 adjustment date' means, in the case of any taxpayer, the first day of his first taxable year beginning after December 31, 1955.

"(5) PREDECESSOR. — The term 'predecessor' means any person from whom property of a kind or class to

a reserve for pre-1913 depreciation only. Section 94(f) (1) specifically permits an election to recompute excess profits taxes (in accordance with the reduced reserve) retroactively "as of the changeover date, and as of the beginning of each taxable year thereafter." The final regulations under the section were promulgated on October 13, 1959. In the following month, plaintiff elected its benefits and, then, made formal claims for refund on August 1, 1960 (within two years of the Retirement-Straight Line Adjustment Act of 1958). The Internal Revenue Service rejected the claims on September 8, 1961, and plaintiff's petition was filed in this court a few weeks later. It sues for almost $1,600,000 (plus interest).[5]

In the taxpayer's view, section 94(f) (1) is a retroactive relief provision creating a new cause of action and permitting the otherwise closed years of 1943–1944 to be opened for a recomputation of its excess profits taxes. The Government, in opposition, says that the provision, though retroactive, applies only to those taxpayers whose past years are still open; the statute, according to defendant, does not waive, extend, or revive the ordinary limitations period. These positions match those taken by the parties in Zacks.[6]

The Supreme Court's opinion tells us that, where retroactive tax legislation is claimed to interact with the general limitations provisions of the Code, the issue is to be decided, not by fiat or automatic rules or presumptions, but "on a case-by-case basis, as with all questions of statutory construction." 375 U.S. at 66 n. 8, 84 S.Ct. at 182. The Court stressed that "our sole concern is the intent of Congress in adding this section to the Code [i. e., the particular, retroactive provision applicable in Zacks]" (id., 375 U.S. at 62, 84 S.Ct. at 180) and "whether or not" there should be a waiver of limitations "is a matter for Congress to decide" (id., 375 U.S. at 70, 84 S.Ct. at 184). The opinion repeatedly emphasized "the administrative and legislative background of the [retroactive] enactment" (id., 375 U.S. at 62, 69, 84 S.Ct. at 180), and took pains to canvass that background of the specific section then before the Court (id., 375 U.S. at 62–66, 69–70, 84 S.Ct. 178). The prime effect of the decision was to elevate the direct indicia of Congressional intent in the particular instance, and to deemphasize the creation-of-new-rights versus clarification-of-existing-rights distinction; the latter was relegated to the realm of possible factors which may conceivably have importance in the appropriate context. Id., 375 U.S. at 68 n. 9, 84 S.Ct. 178.[7] For cases like Zacks and this one, the Court thus neutralized the prior doctrines of the lower courts laying down general principles. We have been directed, rather, to search for the answer

---

which this section refers was acquired, if the basis of such property is determined by reference to its basis in the hands of such person. Where a series of transfers of property has occurred and where in each instance the basis of the property was determined by reference to its basis in the hands of the prior holder, the term includes each such prior holder.

"(6) The term 'Secretary' means the Secretary of the Treasury or his delegate.

"(7) The term 'Commissioner' means the Commissioner of Internal Revenue."

5. If recovery were allowed, there would be large offsetting deficiencies in income tax; this would reduce the recovery by approximately one-half.

The Pennsylvania Railroad has brought suit in this court, on the same ground, seeking recovery of over $17,000,000 in excess profits taxes. The Baltimore and Ohio Railroad has filed a claim with the Internal Revenue Service for over $600,000.

6. The present plaintiff filed a brief *amicus curiae* in the Supreme Court's Zacks case.

7. Before the Supreme Court's decision in Zacks, it had been said that, if a retroactive tax statute changed prior law, then, with regard to the newly emergent right, the statute implicitly waived the time-bar for the years within its wake. See Verckler v. United States, 170 F.Supp. 802, 145 Ct.Cl. 252 (1959); Hollander v. United States, 248 F.2d 247 (C.A.2,

in the materials bearing directly and pointedly on the enactment claimed to reopen the barred years. If we cannot find that Congress had that aim, we must continue to apply the normal limitations statutes. See Kellogg-Citizens National Bank v. United States, Ct.Cl., 330 F.2d 635 p. 638 (1964).

Like the statute in Zacks, Section 94 "does not in terms waive the application of the statute of limitations to refund claims then finally barred. On its face, [Section 94] does no more than overrule the Commissioner's position on a matter of substantive law respecting" the excess profits tax from the time when the changeover was made to straight-line depreciation (375 U.S. at 64, 84 S.Ct. at 181). In this respect, plaintiff's case is the exact parallel of Zacks. The mere words, taken alone, are not conclusive in taxpayer's favor.

The "administrative and legislative background," to which we must look is likewise comparable in pinpointing the precise problem with which Congress treated. The reserve for past depreciation, from its inception in the terms letters of the 1940's, had been a source of controversy between the railroad industry and the Government—both as the reserve affected future depreciation and as it bore upon the determination of invested capital for excess profits tax purposes. A large number of railroads (over 50, including plaintiff) observed the terms letters and did not keep open the relevant excess profits tax years. A smaller number (about 12) took steps to prevent the fall of the time-bar for those years. One railroad was successful in a Tax Court proceeding in which it was held

1957); Siegel v. United States, 18 F. Supp. 771, 84 Ct.Cl. 551, 556–557 (1937). See, also, Zacks v. United States, 280 F. 2d 829, 150 Ct.Cl. 814 (1960); Lorenz v. United States, 296 F.2d 746, 155 Ct.Cl. 751 (1961). Compare Smith v. United States, 304 F.2d 267 (C.A.3, 1962). Where the retroactive tax provision is of another type, one which is thought merely to confirm or clarify pre-existing rights, some courts have held that

that the 30 percent reserve was an unlawful imposition. Akron, Canton & Youngstown R. R. v. Commissioner, 22 T.C. 648 (1954). This decision was not a clear-cut holding on the legality of the conditions of the terms letters, since that railroad had been newly formed out of a nontaxable reorganization and was held not to have needed the Commissioner's permission to adopt the straight-line method. Nevertheless, the Akron ruling reflected favorably on the position of the taxpayers who were opting for removal of the conditions and still had live years.[8] In 1954 and 1955, a group of railroad tax lawyers began working with representatives of the Internal Revenue Service and the Treasury Department to attempt to reach an administrative compromise of the tax problems engendered by the terms-letter conditions. The hope of the committee was that, if some over-all accord could be reached, extended litigation would be avoided and adjustments would be made, company by company, evidenced by formal closing agreements. Throughout, the emphasis was on an administrative settlement. After the Akron decision, a letter (dated September 3, 1954) calling attention to it, sent by the committee to the Commissioner of Internal Revenue, urged administrative recognition of the illegality of the conditions imposed at the time of the changeover. The first conferences were inconclusive, but the Treasury and the Service began tentatively to consider the idea of a settlement which would replace the 30 percent reserve with a lower reserve encompassing only pre-1913 depreciation.

On November 1, 1955, the railroads' committee met with representatives of

there is no evidence of a purpose to lift the bar. See United States v. Dempster, 265 F.2d 666 (C.A.6), cert. denied, 361 U.S. 819, 80 S.Ct. 63, 4 L.Ed.2d 65 (1959); Tobin v. United States, 264 F.2d 845 (C.A.5, 1959).

8. Insofar as depreciation was concerned, all railroads with terms letters were interested for current and future years.

the Engineering and Valuation Branch of the Internal Revenue Service to consider the details of a reserve based on pre-1913 depreciation. The Government's proposal was that the adjustments be made prospective only. One of the high-ranking Government representatives (Mr. Spaulding) indicated, however, that he would be receptive to allowing retroactive relief with respect to the adjustment of earnings and profits for excess profits tax purposes, and he requested an estimate of the amounts which would be involved.

In a letter of November 3, 1955, plaintiff's then counsel wrote Mr. Spaulding that of the railroad clients of his firm (which included plaintiff) only the Burlington, Wabash, and the Bangor and Aroostook had pending claims bearing upon the excess profits tax phase of the settlement and would, therefore, be the only ones affected by that part of the settlement. Plaintiff was not included in the letter on the assumption that the Internal Revenue Service could not lawfully make a refund in the absence of a timely refund claim. Similar information was sought from other railroads through a circular distributed by the Association of American Railroads to the Chief Accounting Officers of all Class I roads. The circular stated, in part:

" * * * Government representatives have asked for estimate of effect reduction in reserve * * * would have on excess profits tax liability. To enable us to furnish this information will you please advise (1) *what World War II excess profits tax years are still open or subject to possible refund claims and* (2) *total of estimated net decrease in tax for each open year* * * *

resulting from increase in equity invested capital excess profits tax credit for World War II tax years which would be caused by a reduction of reserve of 30 percent of depreciable assets to (a) 5 percent, (b) 10 percent, (c) 15 percent."

[Emphasis added.]

According to the plain implication of this circular, only those roads which still had open years were to be within the proposed settlement. All of the 126 Class I roads receiving the circular replied and only twelve (plaintiff was not one of them) reported that an increase in equity capital would decrease their tax liability.[9] The results of the survey were tabulated and the information was passed on to the Treasury and the Service.

In the light of this data, another conference (in December 1955) produced the concensus that a pre-1913 reserve be substituted for the 30 percent reserve, with purely prospective application for all phases, except that retroactive effect would be proper for the excess profits tax. The stumbling block was that the Government side was unwilling to take the responsibility of closing the matter in view of the large amounts involved and possible political ramifications. Despite objections from the road representatives that delay and uncertainty would follow in the train of the choice of a legislative solution, high officials of the Treasury felt that the problem should be handled by Congress. Further discussion produced a bill, H.R. 11917, which was introduced in the House of Representatives on June 25, 1956, and which contained essentially the same provisions with respect to the excess profits tax feature as were eventually enacted in section 94(f) (1).[10]

9. Fifty-nine of the replies reported that no World War II excess profits tax years were open or subject to possible refund claims.

10. The facts just recounted are the gist of findings 6–13 made by the Trial Commissioner. Plaintiff has not suggested that these facts are untrue in any way, but

has strenuously urged that they are incompetent and irrelevant to our inquiry. We agree that there is some danger in going beyond the normal printed congressional materials. However, where, as in this case, the printed legislative history makes significant reference to these background facts (as we point out, infra) and there is no dispute as to their ac-

It is incontestable that the solution arrived at, though not put into effect, by the negotiations at the administrative level excluded any excess profits tax benefits for railroads without open years. The introduction of H.R. 11917, which embodied the terms of the compromise, was an attempt to obtain legislative confirmation of the settlement agreed upon by the agencies and the railroads. The legislative history reflects the direct relationship between the administrative agreement and what Congress intended to be the effect of section 94. The printed materials are spotted with references to the fact that section 94 was the legislative authorization or ratification of a negotiated compromise.

In Congress the original bill was referred to the House Committee on Ways and Means. 102 Cong.Rec. 10938 (1956). It was not reported out of committee at that session, but its substance was brought before the House in 1958 (at the Second Session of the 85th Congress) as proposed section 81 of H.R. 8381, a floor amendment to what was to become the Technical Amendments Act of 1958.[11] At that time Congressman Mills, Chairman of the House Ways and Means Committee, told the House "that this amendment is interpreted by the membership of the Committee on Ways and Means as *legislating into law a settlement*. Frankly, that is what I interpret it to be." 104 Cong.Rec. 1222 (emphasis added). After explaining the nature and circumstances of the Commissioner's imposition of the 30 percent reserve for past depreciation, Mr. Mills continued:

"Since that time [the changeover date] a number of court decisions have dealt with the tax effects of the retirement method of computing depreciation and with the tax effects in changing from this method. These decisions relate to a number of different issues. They involve widely varying factual situations and relate, of course, to a very complicated subject. In general, they have thrown doubt upon the validity of the 30-percent reserve requirement imposed upon railroads under the terms letters. As a result of these decisions, the railroads and the Internal Revenue Service have been engaged in a continuing controversy over the tax effects of this change in method of computing depreciation. *The proposed amendment is, in essence, a settlement of this controversy. We are, in effect, legislating*

---

curacy we believe that they should be taken into acount. The Supreme Court, interpreting the retroactive tax statute in Zacks, supra, considered relevant the "administrative" as well as the "legislative background." 375 U.S. at 62, 84 S.Ct. 178.

In the cases on which plaintiff relies (e. g., Ex Parte Collett, 337 U.S. 55, 61, 69 S.Ct. 944, 959, 93 L.Ed. 1207 (1949); United States v. Missouri Pacific R.R., 278 U.S. 269, 278, 49 S.Ct. 133, 73 L.Ed. 322 (1929); McClure v. United States, 95 F.2d 744, 750–751 (C.A.9, 1938), aff'd, 305 U.S. 472, 59 S.Ct. 335, 83 L.Ed. 296 (1939)), it was thought that the legislative will was made so abundantly clear on the face of the statute that it was unnecessary to look beyond the plain language. But the Supreme Court has also indicated, several times, that all background materials are competent in interpreting legislation. Boston Sand & Gravel Co. v. United States, 278 U.S. 41, 48, 49 S.Ct. 52, 73 L.Ed. 170 (1928); United States v. Dickerson, 310 U.S. 554, 562, 60 S.Ct. 1034, 84 L.Ed. 1346 (1940); United States v. American Trucking Ass'ns, 310 U.S. 534, 542–544, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940); Harrison v. Northern Trust Co., 317 U.S. 476, 479, 63 S.Ct. 361, 87 L.Ed. 407 (1943); United States v. Universal C. I. T. Credit Corp., 344 U.S. 218, 221, 73 S.Ct. 227, 97 L.Ed. 260 (1952). And the Court's Zacks opinion teaches that, when the case involves the effect on limitations of retroactive tax legislation (which is inexplicit), the courts are *required* to dig below the surface of the statute. Cf. Commissioner v. Bilder, 369 U.S. 499, 504, 82 S.Ct. 881, 8 L.Ed.2d 65 (1962).

11. There is no House Committee report on the proposal since it was offered on the floor.

*into law this settlement.*" [Emphasis added.]

The Chairman also explained how the federal revenue might suffer if the taxpayer-railroads resorted to the *courts* as compared to what the compromise would mean in terms of revenue loss (104 Cong. Rec. 1222):

> "If the Internal Revenue Service failed completely, to sustain its position in court, it has been estimated that there might be a revenue loss of as much as $273 million—in refunds and interest—for the years 1943–55, and that, for the period 1956–95, there would be a total reduction in income taxes approximately $50 million greater than under the proposed amendment. If the amendment is adopted, the Government will pick up approximately $250 million which it would have lost if it failed to sustain its position in court, and, in addition, will pick up an additional $50 million by limiting the deductions for the years 1956–95."

This statement forcefully implies that the retroactive tax measure was considered to apply only to those taxpayers who still had the legal right to recover in court. It would be anomalous for Congress, apparently fearful of the loss of revenue following from litigation, to enact a statute which would open the floodgates to very large claims of taxpayers who would otherwise have been able to obtain nothing—who would have no possibility of success in the courts because they were barred by limitations.

There was no discussion of the proposal on the Senate floor, but the short report of the Senate Finance Committee significantly repeats the reference to a "settlement":

> "This section, which may be cited as the 'Retirement-Straight Line Adjustment Act of 1958,' provides a settlement of a problem involving the retirement method of accounting which has existed for a number of years and has presented difficulties in tax administration. It is the same as section 81 of the House bill except for a technical amendment in subsection (d) thereof." [S.Rep.No. 1983, 85th Cong., 2d Sess., 1958 U. S.C.Cong. and Adm.News, p. 5030.]

Previously, at the hearings before the Senate Committee, there had been pointed words about the administrative agreement. Senator Douglas spoke of "the negotiation of the agreement which resulted" in the proffered section and asked whether the proposal "represent[ed] an agreement between the Treasury and the Association of American Railroads." The witness, who had participated in the meetings, answered that "it represents the result of the efforts of the representatives of the Treasury Department and the committee representing the association." When the Senator said that his understanding was that "in effect an out-of-court settlement has been made between the Treasury and the railroads which the Congress is now asked to legitimatize by enacting into law," the witness answered: "I think that is substantially what the chairman of the Ways and Means Committee said when he presented the bill in the House." Senate Hearings on H.R. 8381, 85th Cong., 2d Sess., pp. 382–385. The Financial Vice-President of the Akron, Canton and Youngstown Railroad testified that the "section is presented as an agreed measure between the major railroads and the Treasury Department" and explained that it "simply involves legislative confirmation or approval of an administrative settlement that has been worked out between the major railroads and the Treasury Department. In other words, what is being asked is congressional sanction for an administrative compromise or modification of the terms letter agreements which could be affected without legislation by closing agreement or otherwise." Id. at 387. It is also noteworthy that Senator Douglas wanted to know the number of cases then in litigation and how much money was involved "and what the prospects would have been of

recovery if suit had been carried on." Id. at 385.[12]

 This legislative history, spare as it is, shows affirmatively that Congress thought that it was doing little more than sanctioning the administrative agreement hammered out by the Government and the railroads. With respect to excess profits taxes that settlement was confined to open years, and there is nothing to suggest that Congress intended, or was asked, to go further. On the contrary, the expressed legislative concern with the monetary reach of the proposal strongly implies that Congress would have been wary of granting greater tax benefits than the agreement contemplated and the Treasury proposed. Silence as to limitations means, in this instance, too, that Congress was content to have its change in the law affect only the "years and claims not barred" (United States v. Zacks, 375 U.S. at 70, 84 S.Ct. at 184).

We could well rest at this point, but we also note, as did the Supreme Court in Zacks (375 U.S. at 65–67, 84 S.Ct. 178), that where Congress, in other parts of the Technical Amendments Act of 1958, wished to extend the statute of limitations it made explicit provision. See sections 14, 29, 36, 92, 93 and 100, 72 Stat. 1611, 1626–1629, 1633, 1667, 1668, 1673–1674. Although the two amendments immediately preceding section 94 specifically refer to the statute of limitations, no such provision was included for section 94. This is further proof that Congress intended no waiver, revival, or extension of the ordinary time-bar when it passed the Retirement-Straight Line Adjustment Act of 1958.

For these reasons, we hold that plaintiff is barred by limitations and is not entitled to recover. The petition is dismissed.

12. Plaintiff points out that the data provided to the Senate on the revenue impact of the proposal related only to the other aspect of the bill—allowing future increases in depreciation allowances for depreciation purposes—and not to the retroactive relief from excess profits taxes. This phase of the legislative history seems to us to cut against, rather than for, plaintiff's position. The Congress which was worried about the effect on the revenue of the prospective features of the bill is not likely to have thought that the retroactive impact would be as large as plaintiff's contention would necessarily make it, or to accept such an enlargement of the proposal.