**UNITED SHOE WORKERS OF AMERICA, AFL–CIO, et al., Appellants,**

**v.**

**Catherine BEDELL, Chairman, et al.**

**No. 72–1554.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 6, 1973.

Decided Oct. 23, 1974.

---

John Silard, Washington, D. C., with whom Joseph L. Rauh, Jr., Washington, D. C., was on the brief, for appellants.

Stephen F. Eilperin, Atty., Dept. of Justice, with whom Harold H. Titus, Jr., U. S. Atty., at the time brief was filed, and Morton Hollander, Atty., Dept. of Justice, were on the brief, for appellees. Alan S. Rosenthal, Atty., Dept. of Justice, also entered an appearance for appellees.

Before BAZELON, Chief Judge, and LEVENTHAL and ROBINSON, Circuit Judges

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

Section 301(a)(2) of the Trade Expansion Act of 1962 [1] authorizes a labor union, on behalf of its members, to petition the United States Tariff Commission for "adjustment assistance"[2] when, as provided by Section 301(c)(2), increased importation of "an article like or directly competitive with an article produced by such workers' firm" has "caus[ed], or threaten[ed] to cause, unemployment or underemployment" of such workers.[3] Appellants [4] brought this action in the District Court seeking a judgment declaring that adjustment assistance is available to workers when the market for the article their firm produces is being injured or threatened by imported articles that contain the firm's product as a component.[5] Both appellants and appellees [6] filed motions for summary judgment, and the District Court granted judgment in favor of appellees.[7]

After setting out the procedural background of this appeal,[8] we trace the historical development of the phrase "like or directly competitive" through earlier trade acts [9] and the passage of the Trade Expansion Act.[10] We also consider the effect of the legislative definition of "directly competitive" in construing the word "like" [11] and the relevancy of a current act that includes the same phrase.[12] We affirm the judgment of the District Court. We hold that imported finished women's shoes are not

---

1. 19 U.S.C. § 1801 et seq. (1970); Act of Oct. 11, 1962, Pub.L.No. 87–794.

2. Adjustment assistance may consist of direct payments to workers who are unemployed due to increased imports resulting from trade concessions, retraining and job placement for such workers, or other relief provided in the Trade Expansion Act. See 19 U.S.C. §§ 1931–1978 (1970).

3. Section 301(a)(2) provides:
   A petition for a determination of eligibility to apply for adjustment assistance . . . may be filed with the Tariff Commission by a group of workers or by their certified or recognized union or other duly authorized representative.
   19 U.S.C. § 1901(a)(2) (1970).
   Section 301(c)(2) provides:
   In the case of a petition by a group of workers for a determination of eligibility to apply for adjustment assistance . . . the Tariff Commission shall promptly make an investigation to determine whether, as a result in major part of concessions granted under trade agreements, an article like or directly competitive with an article produced by such workers' firm, or an appropriate subdivision thereof, is being imported into the United States in such increased quantities as to cause, or threaten to cause, unemployment or underemployment of a significant number or proportion of the workers of such firm or subdivision.
   19 U.S.C. § 1901(c)(2) (1970).
   The Act has been construed as establishing four criteria for a favorable recommendation for adjustment assistance. The Commission must find that importation of an article like or directly competitive with the article produced by the petitioners' firm has increased; that the increase is in major part the result of concessions granted under trade agreements; that the workers are unemployed, underemployed or threatened by such a condition; and that the imported article is the major factor causing or threatening to cause the unemployment or underemployment of such workers. See, e. g., Heels, Soles & Soling Sheets, Tariff Comm'n Pub. No. 441, at 3 (Dec., 1971). This appeal involves only the first criterion.

4. Appellants are the United Shoe Workers of America, AFL–CIO, and its president, as representatives of the workers of the Brown Counter Company of Haverhill, Massachusetts. See note 3, supra.

5. Granting this relief would also trigger the requirement in § 301(c)(2) that the Commission promptly investigate to determine whether appellants meet the statutory criteria. See note 3, supra.

6. Appellees are the six Commissioners of the United States Tariff Commission.

7. United Shoe Workers v. Bedell, Civil No. 2197–71, (D.D.C. May 9, 1972).

8. See Part I, infra.

9. See Part II(A), infra.

10. See Part II(B), infra.

11. See Part III, infra.

12. See Part IV, infra.

"like"[13] domestic components of women's shoes within the meaning of Section 301(c)(2).

## I. PROCEDURAL BACKGROUND

Brown Counter Company manufactures counters [14] for women's shoes and sells them solely to domestic manufacturers of ready-to-wear shoes. A counter is a necessary component of a normal shoe [15] because the leather in the heel of the shoe could not hold its shape without the reinforcement the counter provides. Shoe manufacturers generally purchase counters from independent suppliers like Brown instead of making them in their own factories.

Appellants petitioned the Tariff Commission, contending that the increased importation of "wholly assembled women's footwear," brought on by tariff concessions, had severely reduced domestic production of shoes and consequently had diminished the demand for domestic counters. The Commission found that importation of counters for women's shoes had been "negligible or nil" and rejected appellants' petition,[16] stating that it "does not regard imports of women's footwear containing counters to be

'directly competitive' with counters." [17] Appellants' motion for reconsideration by the Commission was denied.

Appellants' action was then brought in the District Court for review of the Commission's decision. The court found the Commission's conclusion "appealing on semantic, legal and practical grounds," [18] and held that "component part manufacturers must of necessity be excluded from the adjustment assistance scheme of the Trade Expansion Act of 1962." [19] Accordingly, summary judgment for appellees was granted.

Appellants first argue that the District Court's judgment is contrary to the plain meaning of Section 301(c)·(2). They also maintain that the decision is inconsistent with the congressional intent and purpose revealed in the legislative history of the Trade Expansion Act. Finally, appellants assert that the interpretation of analogous statutory provisions requires reversal. We find none of these contentions persuasive.

■■ In construing statutes, courts must first look to the language of the legislation; [20] if its language "admits of no more than one meaning, the duty of interpretation does not arise . . . ." [21]

---

13. Appellants do not argue that the words "directly competitive" in § 301(c)(2) were intended to encompass the present situation. Brief for Appellants at 8.

14. A counter is a stiffener, made of plastic and fiber, which is placed around the heel of the shoe.

15. As distinguished from a sandal or open-back shoe.

16. The Commission's decision was transmitted in a letter that in relevant part read:

The Commission considered this petition and has declined to accept it. As you are aware, the provisions of Section 301(c)(2) require that imports of an article "like or directly competitive" with an article produced by the workers' firm be "in such increased quantities" as to cause or threaten to cause unemployment or underemployment of a significant number or proportion of the workers of the firm. Imports of articles "like or directly competitive" with the article produced by Brown Counter Company, viz., counters for women's footwear, have been negligible

or nil. The Commission does not regard imports of women's footwear containing counters to be "directly competitive" with counters, within the meaning of that term in Section 301(c)(2).

17. See note 16, *supra*.

18. United Shoe Workers v. Bedell, *supra* note 7, at 2.

19. *Id.* at 4.

20. See United States v. Bass, 404 U.S. 336, 339, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971); Caminetti v. United States, 242 U.S. 470, 485, 37 S.Ct. 192, 61 L.Ed. 442 (1917); Zaimi v. United States, 155 U.S.App.D.C. 66, 71, 476 F.2d 511, 516 (1973).

21. Caminetti v. United States, *supra* note 20, 242 U.S. at 485, 37 S.Ct. 192, 194. See also Callanan v. United States, 364 U.S. 587, 594–595, 81 S.Ct. 321, 5 L.Ed.2d 312 (1961); United States v. Public Util. Comm'n, 345 U.S. 295, 312–313, 73 S.Ct. 706, 97 L.Ed. 1020 (1953); Sea-Land Serv., Inc. v. FMC, 131 U.S.App.D.C. 246, 248–249, 404 F.2d 824, 826–827 (1968); District of Columbia

This task cannot be performed by looking at a single word in isolation.[22] Appellants and appellees both present us with arguments assigning a plain meaning to "like" in Section 301(c)(2). We have scrutinized the Trade Expansion Act in its entirety and are unable to accept either argument. The strongest conclusion yielded by our analysis of the bare language of the Act is that it could be read to embrace either interpretation.

■ When the meaning of a word in a statute is not clear from the language of the statute itself, "there must be recourse to all the aids available in the process of construction, to history and analogy and practice as well as to the dictionary."[23] We turn first to legislative history of the Act and preceding analogous provisions.

## II. THE LEGISLATIVE HISTORY OF THE TRADE EXPANSION ACT

### A. *Prior Legislation*

In 1934, the Reciprocal Trade Agreements Act[24] launched a reciprocal trade agreements program. The Act was one of several emergency measures adopted to revive our economy, and was the first relaxation of the solid tariff wall erected by the Smoot-Hawley Tariff Act of 1930.[25] The trade agreements program has since become a standard feature in our national economic policy.

The Reciprocal Trade Agreements Act authorized the President to negotiate with other countries a mutual lowering of tariffs.[26] This authorization was a bold new step, however, and the inability to forecast the effects of tariff concessions resulted in embodiment in most trade agreements of an escape clause allowing for modification or withdrawal of the concessions.[27]

In 1947, an executive order established a standard clause to be included in every trade agreement.[28] To trigger an invocation of the standard clause, a domestic manufacturer had to show that an imported product was "like or similar" to his product, and had caused or threatened to cause him serious injury.[29] Shortly after issuance of this order, the General Agreement on Tariff and

Nat'l Bank v. District of Columbia, 121 U.S.App.D.C. 196, 198, 348 F.2d 808, 810 (1965).

22. Boys Markets, Inc. v. Retail Clerk's Local, 770, 398 U.S. 235, 250, 90 S.Ct. 1583, 26 L. Ed.2d 199 (1970) ; United States v. American Trucking Ass'n, 310 U.S. 534, 544, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940) ; Smither & Co. v. Coles, 100 U.S.App.D.C. 68, 70, 242 F.2d 220, 222, cert. denied, 354 U.S. 914, 77 S.Ct. 1299, 1 L.Ed.2d 1129 (1957) ; Elizabeth Arden Sales Corp. v. Gus Blass Co., 150 F.2d 988, 993, 161 A.L.R. 370 (9th Cir.), cert. denied, 326 U.S. 773, 66 S.Ct. 231, 90 L.Ed. 467 (1945).

23. Norwegian Nitrogen Prods. Co. v. United States, 288 U.S. 294, 317, 53 S.Ct. 350, 359, 77 L.Ed. 796 (1933). See Mastro Plastics Corp. v. NLRB, 350 U.S. 270, 278, 76 S.Ct. 349, 100 L.Ed. 309 (1956) ; In re Lambert, 92 U.S.App.D.C. 104, 203 F.2d 607 (1953).

24. Act of June 12, 1934, ch. 474, 48 Stat. 943.

25. Act of June 17, 1930, ch. 497, 46 Stat. 590.

26. For a period of three years, the Reciprocal Trade Agreements Act authorized the President to negotiate for a reciprocal lowering of tariffs to not less than 50% of their 1930 levels whenever existing duties or restrictions where unduly burdening foreign trade. Act of June 12, 1934, ch. 474, § 350(a), 48 Stat. 943 (1934).

27. See Report on Trade-Agreement Escape Clauses, H.R.Doc.No.328, 82d Cong., 2d Sess. 7–8 (1952).

28. "There shall be included in every trade agreement hereafter entered into under the authority of [the Reciprocal Trade Agreements Act] as amended, a clause providing in effect that if, as a result of unforeseen developments and of the concession granted by the United States on any article in the trade agreement, such article is being imported in such increased quantities and under such conditions as to cause, or threaten, serious injury to domestic producers of like or similar articles, the United States shall be free to withdraw the concessions, in whole or in part, or to modify it, to the extent and for such time as may be necessary to prevent such injury." Exec.Order No. 9832, 3 C.F.R. 624, 625 (1943–48 Comp.).

29. See note 28, *supra.*

Trade[30] was signed in Geneva; it changed the word "similar" to "directly competitive,"[31] and this new term was adopted in 1949 by another executive order.[32]

When Congress enacted the Trade Agreements Extension Act of 1951,[33] it adopted the "like or directly competitive" formula as the criterion for invoking escape-clause protection.[34] The first congressional indication of the meaning of this phrase came during the debates on the Trade Agreements Extension Act of 1955.[35] Senator Morse introduced an amendment to the 1951 Act[36] that, in his view, would have given producers of "raw materials and components" the procedural right to be heard before the Tariff Commission.[37] On its face, the Morse amendment would have afforded component parts manufacturers the same relief as manufacturers of finished products, even if the "like or directly competitive" article entered the United

30. Act of Oct. 30, 1947, 61 Stat. A 12.

31. Act of Oct. 30, 1947, Art. XIX, § 1(a), 61 Stat. A 58.

32. Exec.Order No. 10082, 3 C.F.R. 281 (1949–53 Comp.).

33. Act of June 16, 1951, ch. 141, 65 Stat. 72.

34. "Should the Tariff Commission find, as the result of its investigation and hearings, that a product on which a concession has been granted is, as a result, in whole or in part, of the duty or other customs treatment reflecting such concession, being imported in such increased quantities, either actual or relative, as to cause or threaten serious injury to the domestic industry producing *like or directly competitive* products, it shall recommend to the President the withdrawal or modification of the concession, its suspension in whole or in part, or the establishment of import quotas, to the extent and for the time necessary to prevent or remedy such injury. . . ." Trade Agreements Extension Act of 1951, § 7(a), 65 Stat. 74 (emphasis added).

35. Act of June 21, 1955, ch. 169, 69 Stat. 162.

36. In 1955, Congress added to the Trade Agreements Extension Act of 1951 a definition of "domestic industry":

[T]he terms 'domestic industry producing like or directly competitive products' and 'domestic industry producing like or directly competitive articles' mean that portion or subdivision of the producing organizations manufacturing, assembling, processing, extracting, growing, or otherwise producing like or directly competitive products or articles in commercial quantities. In applying the preceding sentence, the Commission shall (so far as practicable) distinguish or separate the operations of the producing organizations involving the like or directly competitive products or articles referred to in such sentence from the operations of such organizations involving other products or articles.

Act of June 21, 1955, ch. 169, § 6(b), 69 Stat. 166.

Senator Morse's amendment would have further added, immediately following the word "articles" in the last sentence, "*or raw materials or other components of such products or articles*, respectively; and evidence of serious injury or threat of serious injury to any readily determinable segment of such producing organizations shall, for the purposes of this act, be considered evidence of serious injury or threat of serious injury to the *domestic industry producing like or directly competitive products or articles*." 101 Cong.Rec. 5611 (1955) (emphasis added). The amendment was prompted by a Tariff Commission decision adopting a restrictive view of the term "domestic industry." See Glace Cherries, Report on the Escape-Clause Investigation, Tariff Comm'n Rep. No.185, 2d Ser. (1953); 101 Cong.Rec. 5612 (1955); text *infra* at notes 67–70.

37. 101 Cong.Rec. 5612 (1955). As to Senator Morse's procedural comments, we do not think the Commission's ruling in the *Glace Cherries* case denied the component parts industry standing to be heard under the 1951 Act. See Glace Cherries, Report on the Escape-Clause Investigation, Tariff Comm'n Rep.No.185, *supra* note 36. Section 7 of the Act, like § 301 of the Trade Expansion Act of 1962, defined criteria that a petitioner must satisfy before the Commission could make a favorable finding. See note 3, *supra*. The thrust of the Commission's holding was not that the component parts industry could never seek relief under the Act, but that it could not satisfy the criteria of § 7 when the product in question was imported as a component of a finished article. See text *infra* at notes 64, 70. Thus, the Commission's ruling went directly to the ability of the cherry growers to obtain relief when injured by imported glace cherries, which are processes from sweet cherries. See note 69, *infra*. Nothing short of explicit substantive rights would have given producers of raw materials and components relief in similar factual situations.

States as a component of a finished product.[38]

The Executive Branch obviously understood the amendment to have this effect;[39] through its counsel it commented that the amendment "would be impossible to administer" and would "permit . . . manufacturers of nuts and bolts to claim escape-clause relief on account of the importation of automobiles."[40] This reading of the proposed amendment finds additional support in Senator Morse's expressed concern that a Tariff Commission holding had brought domestic manufacturers of finished products within the scope of the 1951 Act, but had excluded producers of "raw material or components from which the finished product [was] prepared."[41] Congress rejected the Morse amendment.[42]

### B. The Trade Expansion Act

The Trade Expansion Act of 1962 must be viewed in this historical context. Until 1962, increased tariffs and withdrawal of concessions were the only options available to the President for relief of domestic manufacturers and their employees from increased imports due to trade concessions.[43] The Act, for the first time, gave the President the alternative remedy of adjustment assistance. There is no evidence, however, that Con-

gress intended this new approach to benefit producers of component parts when the allegedly competing item has been processed into an entirely new article. Indeed, the legislative history compels the opposite conclusion.

During the congressional hearings[44] and debates,[45] the adjustment assistance provisions received considerable attention. There were numerous protests that some workers would receive preferential treatment over others.[46] More importantly, there were informative statements by key legislators dealing with the precise question confronting this court.

Some members of the House Ways and Means Committee analyzed the adjustment assistance provision as follows:

> The displacement of a group of workers of the firm producing an article affected by imports, also affects the jobs of workers of other firms supply-services or components to the firm producing the article. The latter receive no special consideration under the bill, although equally affected by the same governmental act.[47]

On the floor of the House, Representative Utt gave an example of his understanding of the bill:

> Corporation A goes out of business because of imports. It had 500 em-

---

38. See note 36, *supra.*

39. The Morse amendment was submitted along with other amendments to the Executive Branch for comment. 101 Cong.Rec. 5613 (1955).

40. 101 Cong.Rec. 8162 (1955).

41. 101 Cong.Rec. 5612 (1955). Senator Morse was referring to the holding in the *Glace Cherries* Case, *supra* note 36.

42. 101 Cong.Rec. 8160 (1955). A similar amendment was also rejected in 1958. 104 Cong.Rec. 16821, 16832–33 (1958).

43. Workers received only incidental relief before the Trade Expansion Act, because a petition for relief under the escape clause protection could be made only by their employers.

44. The Senate hearings, at least once, directly addressed the issue presented on this ap-

peal. That occurred in a colloquy between Senator Curtis and Mr. Behrman, Assistant Secretary of Commerce for International Affairs and one of the administration's spokesmen in support of the bill, on a question put by the Senator:

Q. Now, suppose there is in the same city a concern whose major business is supplying the factory that closed because of imports. Could they apply for relief?

A. No sir.

Hearings on H.R. 11970 Before the Senate Comm. on Finance, 87th Cong., 2d Sess., pt. 1, at 196 (1962).

45. See generally 108 Cong.Rec. 12007–13 (1960).

46. *Id.*

47. H.R.Rep.No.1818, 87th Cong., 2d Sess. 93 (1962).

ployees. Corporation B, which was the sole supplier of that firm goes out of business. One of them received a plush, plush unemployment training program. The other receives nothing.[48]

A similar view was reflected in the report of the Senate Finance Committee, which expressed concern that

[a] person whose unemployment is caused by the executive granting concessions to destroy his job will draw a higher rate of unemployment compensation, for a longer period, than his neighbor who is secondarily unemployed because his employment was based upon goods or services provided to the business which closed because of imports.[49]

Appellants contend that much of this legislative history is of no weight in interpreting the Trade Expansion Act because the statements present the views of its opponents. Solely the views of the proponents, they assert, may be examined.[50]

■ We recognize that statements in legislative debates are generally not an appropriate source to discern the meaning of statutory language.[51] The principle that appellants invoke is, however, "rather an axiom of experience than a rule of law and does not preclude consideration of persuasive evidence if it exists." [52] Undoubtedly, some statements will receive more weight than others; some will receive no weight at all —for example, when they are contradictory or ambiguous. Where there is unanimity between the proponents and opponents of legislation, as here, we perceive no justification for a per se rule disallowing consideration of statements made by opponents of a bill.[53]

■ Appellants also argue that earlier trade statutes, which were keyed to

48. 108 Cong.Rec. 12007 (1962). Congressman Fenton's views were the same:
[W]orkers unemployed because of increased imports would receive [adjustment assistance] . . . . In contrast, a domestic worker who becomes unemployed because his employer might be a supplier to a firm closed down by foreign imports, is limited to State unemployment compensation. . . ."
108 Cong.Rec. 11948 (1962).

49. S.Rep.No.2059, 87th Cong., 2d Sess. 40 (1962) (individual views of Senator Curtis). Senator Curtis, chairman of the Senate Finance Committee, also stated his views during the floor debate:
Suppose a factory were to close because of imports as the result of this act. As the bill stands, those who thus become unemployed would draw perhaps twice as much, and for twice as long a time, as would other unemployed persons in the same community. Yet some of those unemployed would be in that situation because they had been providing goods and services to the industry which had to close.
108 Cong.Rec. 19791 (1962).

50. Appellants' position has some support in the case law. See, e. g., Schwegmann Bros. v. Calvert Distillers Corp., 341 U.S. 384, 394–395, 71 S.Ct. 745, 95 L.Ed. 1035 (1951); McCaughn v. Hershey Chocolate Co., 283 U.S. 488, 493–494, 51 S.Ct. 510, 75 L.Ed. 1183 (1931). But we do not think this

principle is a hard and fast rule of law. There are few, if any, inflexible rules regarding the use of legislative material in construing statutes. At one time, the traditional view was that congressional debates were not to be considered at all. See Aldridge v. Williams, 44 U.S. (3 How.) 9, 19–20, 11 L.Ed. 469 (1844).

51. United States v. UMW, 330 U.S. 258, 278, 67 S.Ct. 677, 91 L.Ed. 884 (1947); FTC v. Raladam Co., 283 U.S. 643, 650, 51 S.Ct. 587, 75 L.Ed. 1324 (1931); McCaughn v. Hershey Chocolate Co., supra note 50, 283 U.S. at 494, 51 S.Ct. 510.

52. Boston Sand & Gravel Co. v. United States, 278 U.S. 41, 48, 49 S.Ct. 52, 54, 73 L.Ed. 170 (1928).

53. Arizona v. California, 373 U.S. 546, 583 n. 85, 83 S.Ct. 1468, 10 L.Ed.2d 542 (1963); Apex Hosiery Co. v. Leader, 310 U.S. 469, 495 n. 15, 60 S.Ct. 982, 84 L.Ed. 1311 (1940); Bauers v. Heisel, 361 F.2d 581, 588 n. 8 (3d Cir. 1966), cert. denied, 386 U.S. 1021, 87 S.Ct. 1367, 18 L.Ed.2d 457 (1967). See United States v. City and County of San Francisco, 310 U.S. 16, 22–26, 60 S.Ct. 749, 84 L.Ed. 1050 (1940); FTC v. Raladam Co., supra note 51, 283 U.S. at 650, 51 S.Ct. 587; Switchmen's Union v. National Mediation Bd., 77 U.S.App.D.C. 264, 265, 135 F.2d 785, 796, rev'd on other grounds, 320 U.S. 297, 64 S.Ct. 95, 88 L.Ed. 61 (1943). Cf. NLRB v. Lion Oil Co., 352 U.S. 282, 292, 77 S.Ct. 330, 1 L.Ed.2d 331 (1957).

the standard escape-clause protection,[54] are of little value in construing the Trade Expansion Act because adjustment assistance was a new concept. But it is well settled that, absent evidence to the contrary,[55] words or phrases taken from prior legislation will be given the same meaning,[56] since there is hardly a basis for assuming that the lawmakers had anything else in mind. This consideration is even more compelling where, as here, the provision containing the word in question is part of a statute that is merely a continuation of earlier legislative schemes.[57]

The phrase "like or directly competitive" was first adopted by Congress in Section 7 of the Trade Agreements Extension Act of 1951, the statutory provision originally defining criteria for invoking escape-clause protection.[58] Section 301 of the Trade Expansion Act uses the phrase "like or directly competitive" in the same context as Section 7 of the 1951 Act.[59] Appellants have tried to refute this obvious conclusion by arguing that adjustment assistance was such a new concept that Congress at-

tached a new meaning to the phrase. It does not follow, however, that Congress, merely by providing a new remedy, also sought to extend the scope of the protection, "unless the intent of the legislature to alter the law is evident or the language of the new act is palpably such as to require a different construction." [60]

■ Congressman Mills, a manager of the bill in the House, saw the Trade Expansion Act criteria as covering "the type of situation we have always described under the escape clause, where injury has occurred." [61] Furthermore, adjustment assistance is neither automatic nor exclusive; the older remedies of modifying quotas or duties may still be utilized under the Act.[62] We conclude that drawing on earlier trade statutes to interpret the statute in question is proper.

■ That Congress rejected an amendment that, on its face, would have given appellants the very protection they now seek, and that the exclusion of component parts manufacturers from the adjustment assistance provisions was recognized during congressional consid-

54. See text and notes *supra* at notes 27–34.

55. See Hynes v. Grimes Packing Co., 337 U. S. 86, 116, 69 S.Ct. 968, 93 L.Ed. 1231 (1949) ; United States v. Arizona, 295 U.S. 174, 191, 55 S.Ct. 666, 79 L.Ed. 1371 (1935) ; United States v. Jefferson Elec. Co., 291 U.S. 386, 396, 54 S.Ct. 443, 78 L.Ed. 859 (1934) ; Reiche v. Smythe, 80 U. S. (13 Wall.) 162, 165, 20 L.Ed. 566 (1871).

56. Hynes v. Grimes Packing Co., *supra* note 55, 337 U.S. at 116, 69 S.Ct. 968; United States v. CIO, 335 U.S. 106, 112–113, 68 S. Ct. 1349, 92 L.Ed. 1849 (1948) ; Marks v. United States, 161 U.S. 297, 302, 16 S.Ct. 476, 40 L.Ed. 706 (1896).

57. See, *e. g.*, United States v. Jefferson Elec. Co., *supra* note 55, 291 U.S. at 396, 54 S.Ct. 443 ; Burnet v. Harmel, 287 U.S. 103, 108, 53 S.Ct. 74, 77 L.Ed. 199 (1932).

58. See note 34, *supra*.

59. "The term 'like or directly competitive', used in the bill to describe the products of domestic producers that may be adversely affected by imports, was used in the same context in section 7 of the 1951 Extension Act and in section 301 of the Trade Expansion Act. The term was derived from the

escape-clause provisions in trade agreements, such as article XIX of the GATT." H.R. Rep.No.1435, 91st Cong., 2d Sess. 25 (1970). See text *supra* at notes 30–34.

60. United States v. Thompson, 319 F.2d 665, 669 (2d Cir. 1963).

61. 108 Cong.Rec. 11997 (1962).

62. After receiving a report from the Tariff Commission containing an affirmative finding under section 1901(b) of this title with respect to any industry, the President may—
(1) provide tariff adjustment for such industry pursuant to section 1981 or 1982 of this title,
(2) provide, with respect to such industry, that its firms may request the Secretary of Commerce for certifications of eligibility to apply for adjustment assistance under part II of this subchapter,
(3) provide, with respect to such industry, that its workers may request the Secretary of Labor for certifications of eligibility to apply for adjustment assistance under part III of this subchapter, or
(4) take any combination of such actions.
Trade Expansion Act of 1962, § 302(a), 19 U.S.C. § 1902(a) (1970).

eration of the Trade Expansion Act, is compelling evidence that Congress did not intend its protections to encompass domestic manufacturers of products of a type not imported as distinct articles. We also find it significant that the Tariff Commission, the agency set up by Congress as its expert overseer of the Act, has reached the same conclusion.

The Commission has recently dealt with petitions for adjustment assistance by component parts manufacturers or their employees, and has uniformly denied assistance in such cases.[63] In the Commission's opinion,

> The interpretative technique of aggregating components in various assembled articles is of recent origin. The mischief inherent in this new technique, injected into use after almost a quarter of a century of settled interpretation, is incalculable. Throughout the history of the trade agreements program, tariff negotiations, by all countries, have been conducted on an article-by-article, item-by-item basis on the principle that the import impact would be on like articles or on articles interchangeable therewith or

substitutable therefor, i. e., directly competitive articles—not on articles so far removed therefrom in the chain of production as to make them totally unrelated in the market place. In contrast, the interpretation in question commits the Commission to analyses of the trade-off between imports of innumerable components and their effect upon many domestic assemblies and end products of which they are a part, and between imports of various assemblies and end products and their effect upon countless domestic components of the types assembled therein.[64]

Although the decisions in this area have all occurred within the last three years, their roots extend deep in adjudicative history.[65] Nearly forty years ago, the Court of Customs and Patent Appeals interpreted the phrase "like or similar" and held that an imported article was "like" a domestic article only if it had "the same or nearly the same appearance, qualities, or characteristics." [66]

The Tariff Commission took the same position shortly after "like or similar" was legislatively changed to "like or di-

---

63. "Undoubtedly, the problems confronting All Star Products are those brought on in large part by increased imports, but t'e increased imports are not of an article like or directly competitive with the variable air tuning capacitors made by All Star Products. Rather, the increased imports are of the final product in which such variable capacitors are used, that is, radio receivers. More and more, U.S. consumption of radios is being supplied from abroad, and the foreign manufacturers are obtaining from abroad components such as variable air tuning capacitors. However, under the Trade Expansion Act of 1962, even taking into consideration section 405(4) of that statute (which further defines "directly competitive with"), it cannot be said that an imported radio or a variable air tuning capacitor within an imported radio is an article directly competitive with the product made by the petitioner." Variable Electrical Capacitors, Tariff Comm'n Pub. No. 423, at 6 (Oct. 1971). See also, Heels, Shoes, and Soling Sheets, Tariff Comm'n Pub. No. 441, *supra* note 3; Heels for Women's Footwear, Tariff Comm'n Pub. No. 440 (Nov. 1971); Women's, Misses', Men's, Youths' and Boys' Footwear, Tariff Comm'n

Pub.No.428 (Oct. 1971). Appellants correctly note that all these decisions came after the Commission's ruling on this case, but that hardly adds weight to appellants' position.

64. Paper Cones for Loudspeakers, Tariff Comm'n Pub.No.362, at 9–10 (Feb. 1971).

65. "It is a familiar rule of statutory construction that great weight is properly to be given to the construction consistently given to a statute by the Executive Department charged with its administration . . . and such construction is not to be overturned unless clearly wrong, or unless a different construction is plainly required." United States v. Jackson, 280 U.S. 183, 193, 50 S.Ct. 143, 146, 74 L.Ed. 361 (1930) (citations omitted).

66. Japan Import Co. v. United States, 86 F. 2d 124, 24 C.C.P.A. 167, 176 (1936). See also American Foundation, Inc. v. United States, 19 C.C.P.A. 36 (1931). "Like" is commonly defined as "having the same, or nearly the same, appearance, qualities, characteristics." Webster's New International Dictionary (2d ed. 1942).

rectly competitive" in 1951.[67] In a 1952 case,[68] the Commission concluded that an imported glace cherry was not "like or directly competitive" with a domestic sweet cherry.[69] It held that "[t]he domestic industry producing glace cherries [could] not properly be considered as including the cherry growers," [70] the producers of domestic sweet cherries.

■■ This construction came shortly after Congress had enacted the Trade Agreements Extension Act of 1951. Since, as we have seen, the tenor of "like or directly competitive" in that statute and in the Trade Expansion Act was the same,[71] this decision bears importantly on the constructional problem at hand. "Contemporaneous interpretation of a statute by those designed to oversee it commands great respect, and courts should accept it absent compelling indication that it is wrong." [72] In the case at bar, the Commission's interpretations have been wholly consistent,[73] and they have withstood the test of time. We conclude that "[o]nly compelling language in the [new] statute itself would warrant the rejection of a construction so long and so generally accepted." [74]

## III. THE DEFINITION OF "DIRECTLY COMPETITIVE"

The validity of our interpretation of the word "like" is further sustained by the meaning that Congress has expressly ascribed to its statutory companion, "directly competitive." [75] Appellants maintain that the Commission, to decide whether an imported product is "like" a domestic product, must disassemble the finished imported article and examine its components. Some comparison of the two products is obviously necessary, but the comparison mandated by the Trade Expansion Act adjustment assistance provisions is not that sought by appellants.

An imported product that is "like" a domestic product will ordinarily be directly competitive with that product. Unless Congress, by using "directly competitive" alternatively, intended to embrace articles not within the scope of "like," [76] the "directly competitive" language is superfluous. From daily experiences, however, we know that many products can be directly competitive without having identical or nearly identical physical characteristics. Normally, the term "directly competitive" invites,

---

67. See text *supra* at notes 30-31.

68. Glace Cherries, Report on the Escape-Clause Investigation, Tariff Comm'n Rep.No. 185, *supra* note 36.

69. Glace cherries are processed from sweet cherries by cooking the sweet cherry in sugar syrup. The only difference between the two cherries, by our understanding, is that the glace cherry has a sugar coating.

70. Glace Cherries, Report on the Escape-Clause Investigation, Tariff Comm'n Rep.No. 185, *supra* note 36, at 7.

71. See text *supra* at notes 58-61.

72. Lenkin v. District of Columbia, 149 U.S. App.D.C. 129, 141, 461 F.2d 1215, 1227 (1972) (footnotes omitted), and cases cited in notes 81-82 therein.

73. See note 63, *supra*.

74. Maynard v. Elliott, 283 U.S. 273, 277, 51 S.Ct. 390, 75 L.Ed. 1028 (1931).

75. See text *supra* at notes 29-34.

76. As noted above, "directly competitive" replaced the adjective "similar" in 1951. See text *supra* at notes 28-31. "Like" and "similar" are adjectives that relate to the characteristics of the products involved, but "directly competitive" deals only with the commercial uses of the products. See note 77, *infra*. It therefore would have been logical for Congress to redefine "like" to encompass all items to be covered in the earlier acts. However, after the Commission excluded from the reach of "like or directly competitive," products that were "substantially the same" but at "an earlier or later stage of processing," Congress expanded the definition of "directly competitive," rather than "like," to encompass those products. See notes 79 and 80, *infra*. This evidence, in our view, is persuasive as to the restrictive sense in which Congress used the word "like."

in the first instance, a comparison of the commercial uses of the products and not their characteristics; the word "like," in common parlance, does the reverse.[77] When Congress realized that the Tariff Commission was excluding any consideration of characteristics in deciding whether articles are directly competitive,[78] it expressly redefined "directly competitive" in the Trade Expansion Act to cover items that were in different stages of processing.[79]

■ In arguing for their broad interpretation of "like," appellants have ignored the impact of this expanded definition of "directly competitive." Even products that are substantially the same must find protection under the term "directly competitive" rather than the adjective "like."[80] Thus, one must approach the question whether an imported article is "like" a domestic article with the knowledge that "like" is the more restrictive of the two terms. If the definition of "like" is kept within its

proper boundaries, we do not believe that the Commission is directed to look at a finished product and isolate each component to compare the product's characteristics. Without additional congressional guidance, we believe the comparison begins and ends with the finished product; to do more would be to attach a meaning to the word that is unsupported in either the statute or its legislative history.

■ If, as appellants urge us to hold, Congress gave "like" a new meaning with the enactment of the Trade Expansion Act, it did so with a curious silence. It is difficult to imagine why Congress would set forth an expanded definition of "directly competitive" in such detail and in the same act leave to chance the understanding of its new meaning of "like." We think there was no new meaning. The interpretation appellants seek has been sought before. It has been rejected both by the Commission[81]

77. "The words 'like' and 'directly competitive,' as used previously and in this bill, are not to be regarded as synonymous or explanatory of each other, but rather to distinguish between 'like' articles and articles which, although not 'like' are nevertheless 'directly competitive'. In such context, 'like' articles are those which are substantially identical in inherent or intrinsic characteristics (i. e., materials from which made, appearance, quality, texture, etc.), and 'directly competitive' articles are those which, although not substantially identical in their inherent or intrinsic characteristics, are substantially equivalent for commercial purposes, that is, are adapted to the same uses and are essentially inter-changeable therefor." H.R.Rep.No.1435, 91st Cong., 2d Sess. 25 (1970).

78. This approach was taken by the Commission in the *Glace Cherries* case, discussed in text *supra* at notes 69–71.

79. "An imported article is 'directly competitive with' a domestic article at an earlier or later stage of processing, and a domestic article is 'directly competitive with' an imported article at an earlier or later stage of processing, if the importation of the imported article has an economic effect on producers of the domestic article comparable to the effect of importation of articles in the same stage of processing as the domestic article.

For purposes of this paragraph, the unprocessed article is at an earlier stage of processing." Trade Expansion Act of 1962, § 405(4), 19 U.S.C. § 1806 (1970).

80. "Your committee has incorporated in the bill a provision which has the effect of permitting an extension of the scope of the term 'directly competitive'. Under this provision, an imported article may be considered 'directly competitive with' a domestic article, or vice versa, if the one is at an earlier or later stage of processing than the other, or if one is a processed and the other an unprocessed form of the same article, and if the economic effect of importation of articles in the same stage of processing as the domestic article.

The term 'earlier or later stage of processing' contemplates that the article remains substantially the same during such stages of processing, and is not wholly transformed into a different article. Thus, for example, zinc oxide would be zinc ore in a later stage of processing, since it can be processed directly from zinc ore. For the same reason, a raw cherry would be a glace cherry in an earlier stage of processing, and the same is true of a live lamb and dressed lamb meat. . . ." H.R.Rep.No.1818, 87th Cong., 2d Sess. 24 (1962).

81. See notes 63, 64 & 68, *supra.*

and by Congress.[82] We reject it today. The ultimate question in this controversy is what is imported within the meaning of the word "like," as used in Section 301(c)(2) of the Trade Expansion Act of 1962, when a finished imported shoe enters the United States—is it the shoe or the counter? We respond, the shoe.[83]

If we accepted appellants' interpretation, the Act's protections could extend to every item produced in the United States that encountered competition from abroad due to trade concessions, regardless of the imported items' characteristics or commercial use. Our interpretation allows the statute to retain its life; appellants' construction would send death marching upon it in a massive and unmanageable volume of claims.

▇▇▇▇ In holding that "like" must be construed as we do today, we are mindful of the remedial purpose of the adjustment assistance provisions. Those provisions are designed to extend relief to manufacturers and workers who, in consequence of governmental action, find themselves idle or jobless. Such remedial legislation should be construed broadly to effectuate its purpose.[84] But we cannot attach to a statute any objective that would negate the limits clearly intended by the legislature.[85] Congress has made a policy decision and drawn a line; our duty is to give the language of the statute a meaning that will carry out that policy. The result may appear harsh in this day of high unemployment and rising cost of living, but the remedy for congressional policies that do not extend beyond lawful bonds is in the legislature.

## IV. THE AUTOMOTIVE PRODUCTS TRADE ACT

Appellants' final contention is that judicial construction of the phrase "like or directly competitive" in the Trade Expansion Act should track its meaning in another piece of legislation. The same language appears in the adjustment assistance provision of the Automotive Products Act of 1965,[86] and under that statute component automotive parts imported as constituents of a finshed automotive product are "like or directly competitive" with duplicating domestic component parts.[87] Appellants urge that this definition compels the conclusion that the Trade Expansion Act also provides adjustment assistance for domestic manufacturers of non-automotive component parts.

There is no doubt, however, that there are critical differences between the two statutes. In the Automotive Products Trade Act, the term "automotive products," which immediately precedes "like or directly competitive," [88] is expressly

---

82. See text and note at note 42, *supra*.

83. Appellants maintain that this reading of the Act infers a "congressional idiosyncracy." United States v. Brown, 333 U.S. 18, 26, 68 S.Ct. 376, 92 L.Ed. 442 (1948); *cf.* Keifer & Keifer v. R. F. C., 306 U.S. 381, 393, 59 S.Ct. 516, 83 L.Ed. 784 (1939). Appellants argue that the exclusion of parts manufacturers and their employees is an arbitrary and incongruous result. We reject that contention. Our construction neither subtracts from nor adds to the congressional purpose; it merely leaves it intact. See 62 Cases of Jam v. United States, 340 U.S. 593, 596, 71 S.Ct. 515, 95 L.Ed. 566 (1951).

84. Peyton v. Rowe, 391 U.S. 54, 65, 88 S.Ct. 1549, 20 L.Ed.2d 426 (1968); Tcherepnin v. Knight, 389 U.S. 332, 336, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967); National Automatic Laundry & Cleaning Council v. Shultz, 143

U.S.App.D.C. 274, 291–292, 443 F.2d 689, 706–707 (1971); Jordan v. Acacia Mut. Life Ins. Co., 133 U.S.App.D.C. 224, 228, 409 F.2d 1141, 1145, cert. denied, 395 U.S. 959, 89 S.Ct. 2101, 23 L.Ed.2d 746 (1969).

85. United States v. Zacks, 375 U.S. 59, 68, 84 S.Ct. 178, 11 L.Ed.2d 128 (1963); Anderson v. Pacific Coast S. S. Co., 225 U.S. 187, 198–199, 32 S.Ct. 626, 56 L.Ed. 1047 (1912); Ingo v. Koch, 127 F.2d 667, 668 (2d Cir. 1942); Ruth v. Eagle-Picher Co., 225 F.2d 572, 575 (10th Cir. 1955).

86. 19 U.S.C. § 2022(b) (1970); Act of October 21, 1965, Pub.L.No.89–283, tit. III, § 302(b), 79 Stat. 1019.

87. See text *infra* at notes 100–01.

88. Automotive Products Trade Act of 1965, § 302(b)(2–3), 19 U.S.C. § 2022(b)(2–3) (1970).

defined to include component parts;[89] the term "an article," which immediately precedes the same phrase in the Trade Expansion Act,[90] is not at all defined legislatively. In its report on the Automotive Products Trade Act, the House Committee on Ways and Means explained that the phrase "like or directly competitive product" encompasses an imported product "not only when it is a separate unit but also when it is included in an automotive vehicle or in another automotive part or component. . . . "[91] On the other hand, congressional rejection of a definitional counterpart for the Trade Expansion Act is disclosed by its legislative history.[92] Thus, unlike its denial of an expanded scope to the Trade Expansion Act, Congress explicitly extended the protections of the Automotive Products Trade Act to manufacturers of automotive components and parts.

Nevertheless, appellants maintain that the two statutes should be construed in pari materia, and that the identical phrases in question should be given the same meaning.[93] But the assertion of a general principle of statutory interpretation is not by itself enough; we cannot properly construe even related pieces of legislation without due regard to the purposes they respectively serve.[94] We must fully explore the allegedly analogous statute and compare it, in light of the factual situation at hand, with the language and objective of the statute under investigation.

Courts have held statutes to be in pari materia in a variety of circumstances.[95] In the present case, both statutes deal with adjustment assistance for workers. It does not follow, however, that we may read them in pari materia. That treatment is not to be accorded where the statutes, though relating to the same subject matter, have significantly different purposes.[96] When all factors are placed on the scale, we

---

**89.** "The term 'automotive product' means a motor vehicle or a fabricated component to be used as original equipment in the manufacture of motor vehicles." Automotive Products Trade Act of 1965, § 302(l)(1), 19 U.S.C. § 2022(l)(1) (1970). The Committee on Ways and Means further defined the term "fabricated component:"

The term "fabricated component" is a term of limitation which embraces finished or unfinished components actually incorporated into a motor vehicle. The term does not, however, include materials, such as metal plate, sheet, strip, wire, pipes and tubes, and textile piece goods. In other words, although at the time of importation the component does not have to be in a condition completely ready for assembly without further fabrication, it must at a minimum be so far processed as to be physically recognizable as a component in an unfinished state.

H.R.Rep.No.537, 89th Cong., 1st Sess. 27 (1965).

**90.** See note 3, *supra.*

**91.** H.R.Rep.No.537, 89th Cong., 1st Sess. 21 (1965).

**92.** See text *supra* at notes 75–79.

**93.** United States v. Zacks, *supra* note 85, 375 U.S. at 67–68, 84 S.Ct. 178; Rosenberg v. United States, 346 U.S. 273, 294, 73 S.Ct.

1152, 97 L.Ed. 1607 (1953); United States v. Stewart, 311 U.S. 60, 64, 61 S.Ct. 102, 85 L.Ed. 40 (1940); United States v. Borden Co., 308 U.S. 188, 198, 60 S.Ct. 182, 84 L.Ed. 181 (1939).

**94.** Myers v. Hollister, 96 U.S.App.D.C. 388, 390, 226 F.2d 346, 348 (1955), cert. denied, 350 U.S. 987, 76 S.Ct. 474, 100 L.Ed. 854 (1956); Bruskas v. Railway Express Agency, 172 F.2d 915, 918 (10th Cir. 1949).

**95.** *E. g.*, United States v. Stewart, *supra* note 93 (two statutes enacted in close proximity by the same Congress in the same session); Commissioner v. Converse, 163 F.2d 131 (2d Cir. 1947) (gift tax and estate tax statutes); A. P. W. Paper Co. v. FTC, 149 F.2d 424 (2d Cir. 1945), aff'd, 328 U.S. 193, 66 S.Ct. 932, 90 L.Ed. 1165 (1946); United States v. Zelker, 335 F.Supp. 85 (S.D.N.Y. 1971) (acts part of a comprehensive scheme).

**96.** "The impeccable principle that statutes in pari materia must be read together, as with most canons of statutory constructions [*sic*], has its opposite number in the dichotomy of well-worn but serviceable canons readily available for use on both sides of any disputed question of interpretation. Thus, 'a statute is not in pari materia if its scope and aim are distinct or where a legislative design to depart from the general purpose

think the dissimilar legislative aims tip the balance decisively.[97]

In 1963, Canada initiated a plan, involving reduced tariffs on exports, designed to expand its share of the North American automotive market. Numerous manufacturers in the United States feared that the plan would injure them, and asked the Government to impose import duties.[98] The United States and Canada then entered into an agreement in an attempt to avoid wasteful retaliation;[99] and the Automotive Products Trade Act was drafted to effectuate this agreement. The draftsmen recognized that potentially increased imports and decreased exports created the possibility of dislocations in domestic manufacturing operations, and for that reason they recommended provision of adjustment assistance.[100]

From the outset, special concern was voiced as to the fate of the independent parts manufacturers in the United States.[101] Senator Hartke, an opponent of the bill, argued that the "crux of the matter lies in what happens to the independent United States parts manufacturer,"[102] and suggested that enactment of the bill would provide strong incentives for parts producers to move their plants to Canada.[103] He quoted the president of a domestic automobile manufacturer as stating that he foresaw "the day when some auto companies may decide to build their entire supply of basic components—frames, engines, transmission, springs—in Canada."[104] While the potential impact of the bill may have appeared more devastating to its opponents, its proponents

---

or policy of previous enactments may be apparent.'" Latimer v. Sears Roebuck & Co., 285 F.2d 152, 157 (5th Cir. 1960). See also Williamson v. Lee Optical Co., 348 U.S. 483, 489, 75 S.Ct. 461, 99 L.Ed. 563 (1955); Roschen v. Ward, 279 U.S. 337, 339, 49 S. Ct. 336, 73 L.Ed. 722 (1928); Ramapo Bank v. Camp, 425 F.2d 333, 346 (3d Cir.), cert. denied, 400 U.S. 828, 91 S.Ct. 57, 27 L.Ed.2d 58 (1970).

97. "The purpose of Congress is a dominant factor in the determination of a statute's meaning, . . . and where a choice may be made between two possible constructions, that construction should be chosen which would serve to effectuate Congressional purpose rather than defeat it." Stella v. Graham-Paige Motors Corp., 104 F.Supp. 957, 959 (S.D.N.Y.1952). See also Hudson Distributors v. Eli Lilly, 377 U.S. 386, 391–392, 84 S. Ct. 1273, 12 L.Ed.2d 394 (1964); Commissioner v. Bilder, 369 U.S. 499, 503, 82 S.Ct. 881, 8 L.Ed.2d 65 (1962); NLRB v. Lion Oil Co., supra note 53, 352 U.S. at 290–292, 77 S. Ct. 330; United States v. City & County of San Francisco, supra note 53, 310 U.S. at 26, 60 S.Ct. 749; United States v. Guaranty Trust Co., 280 U.S. 478, 485, 50 S.Ct. 212, 74 L. Ed. 556 (1930); Fort Smith & Western R. R. Co. v. Mills, 253 U.S. 206, 208, 40 S.Ct. 526, 64 L.Ed. 862 (1920); Gibson v. Missouri Pac. R. R. Co., 441 F.2d 784, 787 (5th Cir.), cert. denied, 404 U.S. 855, 92 S.Ct. 102, 30 L.Ed.2d 96 (1971); Akins v. United States, 439 F.2d 175, 177, 194 Ct.Cl. 477 (1971).

98. Letter from President Lyndon B. Johnson to the Honorable John W. McCormack, H. R.Rep.No.537, 89th Cong., 1st Sess. 2 (1965). See also 111 Cong.Rec. 25529 (1965).

99. The agreement is reproduced in H.R.Rep. No.537, 89th Cong., 1st Sess. 39 (1965).

100. Id. at 3.

101. See generally, 111 Cong.Rec. 25623–28 (1965).

102. 111 Cong.Rec. 25624 (1965).

103. Id. "First, there is the Canadian value added requirement, which disposes the Canadian subsidiaries of U.S. companies to secure as many parts as possible in Canada. Second, there is the competitive advantage to parts made in Canada for unhampered import to the United States for use in manufacture of automobiles here. There is a labor cost differential which has been estimated at 50 to 70 cents an hour. It is that much cheaper in Canada." Id.
Senator Hartke also pointed to some of the developments in the nine months since the signing of the agreement: "Kelsey Wheel Co., of Windsor, Ontario, has started its first export of Canadian-made wheels to the United States, for 1966 models. Employees w..o formerly made these wheels in the United States are no longer making them. General Motors of Canada is exporting Canadian-made interior auto trim to the United States for the first time." Id.

104. Id.

also realized that the independent parts industry could be adversely affected.[105]

The Automotive Products Trade Act thus developed from a unique situation, and its adjustment assistance provisions were designed to deal with the situation within a single industry.[106] These provisions were never intended to be a carbon copy of the Trade Expansion Act provisions.[107] That automotive workers were to be placed in a favored position vis-a-vis other workers was fully recognized.[108] The statutory language and the legislative histories of the two acts clearly demonstrate their diverging roads. The Trade Expansion Act is a general statute covering all non-automotive products imported into the United States under trade agreements; the Automotive Products Trade Act is a statute enacted to meet a special and unique problem arising between the United States and Canada. To apply appellants' interpretation of Section 301(c)(2) of the former would be to repeal it by implication judicially [109] and substitute

105. Senator Smathers, a manager on the part of the Senate, observed that "while we recognize that some people in the parts industry may be affected, while we recognize that some categories of automotive parts, plants, and labor, may be adversely affected, nevertheless it is in the interest of the United States as a whole, our laboring people, and our producing people, that we enter into this agreement. . . ." *Id.* at 25529.

106. "The agreement itself is a new and bold approach directed toward the dismantling of trade barriers thwarting the economic growth of the United States-Canadian auto industry. This binational industry is unique. Unlike the European pattern of automobile production, where neighboring countries have developed their own autonomous industry with distinct body styles and types, the automotive industries of the United States and Canada logically and in reality constitute a single great industry." S.Rep.No.782, 89th Cong., 1st Sess. 6 (1965), U.S.Code Cong. & Admin.News, p. 3674.

"Under the agreement, and as it will be implemented by the bill, duty free treatment is to be limited to automotive products of Canada. This special treatment is admittedly inconsistent with the obligation of the United States, under article I of the General Agreement on Tariffs and Trade (GATT), to accord unconditional most-favored-nation treatment in respect of customs duties to the products of contracting parties to that agreement. However, t'e agreement deals with a special and unique relationship between the United States and Canadian automobile industries." *Id.* at 9, p. 3677.

107. "Your committee believes that these unique features of the agreement and the need for especially expeditious adjustment assistance procedures to relieve the effects of dislocations that might occur within the automotive industry during the transitional period, justifies the special procedures incorporated in section 302 of the bill." *Id.* at 18, p. 3687.

108. "[T]he bill singles out the autoworker for special treatment, while all other workers displaced as a result of tariff concessions must rely upon the adjustment assistance procedures in the Trade Expansion Act. Under the bill, the autoworker applies to the President for special assistance, which can be granted on a discretionary basis, subject to very liberal standards or conditions of qualification. Displaced workers in other industries must prove their case before the Tariff Commission under the regular procedures provided for in the Trade Expansion Act of 1962." H.R.Rep.No.537, 89th Cong., 1st Sess. 57 (1965) (separate views of the Republicans).

"The bill is discriminatory, furthermore, in that it singles out automotive workers for especially favorable adjustment assistance by the U.S. Government, while leaving out workers in other industries subject to the less favorable provisions of Title III of the Trade Expansion Act of 1962. This is outright favoritism." 111 Cong.Rec. 25629 (1965) (remarks of Senator Hartke).

In its report accompanying H.R. 9042, the Committee on Ways and Means observed that: "[t]he discrimination involved here, however, is formal rather than real. The agreement deals with a special and unique relationship between the United States and Canadian automobile industries. As stated previously, motor vehicles, parts, and components are produced in the United States and Canada by companies generally sharing a common ownership, are fully interchangeable, and the geographic proximity of manufacturing facilities, on both sides of the border, contributes to the integral nature of the industry." H.R.Rep.No.537, 89th Cong., 1st Sess. 8 (1965).

109. Universal Interpretive Shuttle Corp. v. Washington Metropolitan Area Transit Comm'n, 393 U.S. 186, 193, 89 S.Ct. 354, 21 L.Ed.2d 334 (1968); Jones v. Alfred H. Mayer Co., 392 U.S. 409, 412–417, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968); United States v.

Section 302(b) of the latter. The adjustment assistance provisions of the two statutes are incongruent in scope and purpose; each can stand alone and achieve its intended goal without a prop from the other. We leave them as we found them.

The judgment appealed from is accordingly

Affirmed.

Zacks, *supra* note 85, 375 U.S. at 67–68, 84 S.Ct. 178, 11 L.Ed.2d 128; Silver v. New York Stock Exchange, 373 U.S. 341, 357, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963).